WAYNE A. COLEMAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - -x

| | | |
|---|---|---|
| THOMAS C. PORTA, et al., | : | No. 05-14210C and |
| and | : | No. 05-759C |
| ANDREW D. BARTH, et al., | : | Consolidated |
| Plaintiffs, | : | |
| v. | : | (Judge Firestone) |
| THE UNITED STATES, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - -x

DEPOSITION OF WAYNE A. COLEMAN

Washington, DC

Wednesday, November 29, 2006

REPORTED BY:

VICTORIA L. WILSON

WAYNE A. COLEMAN

Border Patrol agent.

**Q And would it be the supervisor of the particular employee or the supervisor of the certified timekeeper or the supervisor of the office or is there a difference?**

A It might depend on how big the office was. If it is a small office, then the supervisor that signs might be the supervisor not only for the Border Patrol agent but for the timekeeper, as well. If it is a fairly large office, there might be a number of subordinate supervisors, each of whom has a team of Border Patrol agents working for him or her and then there would be an office chief who would be over that group of people and, typically, the timekeeper, then, would work for that person rather than directly for the first line supervisors.

**Q But --**

A So it would depend on how -- as I say, how large the office is and how the time is done.

**Q But the supervisor's signature here would be the immediate supervisor of the employee; is that right?**

A I would say typically, yes, but that doesn't have to be the case in every single office.





WAYNE A. COLEMAN

It would depend on how close -- as I say, with a very large office, you might want to have somebody overseeing that to be sure -- again, this, essentially, is authorizing the expenditure of Government funds, and in doing that, we want to be careful that we only authorize what employees have actually worked enough to support.

**Q You mentioned before that the typical practice was that an employee would fill out a time sheet if they were at the academy and then that would be faxed to the timekeeper at their duty station; is that right?**

A That's correct.

**Q Do you know if those handwritten time records that the employee filled out are kept as a matter of course?**

A I don't. They may be.

**Q Do you know if a search was made for them in relation to this case?**

A No, that I don't.

**Q Who would know if those records are kept?**

A Well, one would be the staff at FLETC, and so I would say that that would probably be the primary person.





WAYNE A. COLEMAN

**Q So there is two places they could be kept; right? They could be kept at FLETC where they were faxed from or they could be kept at the duty station where they were faxed to; is that correct?**

A That's correct.

**Q Do you know if there is a policy that they are kept at the duty station that they are faxed to?**

A I know, typically, time and attendance records are kept at the duty station where the employee is stationed. What level of files are kept, that I don't know, but they would have to be at least -- I would think there is a minimum. This sort of document where we have a signature from the supervisor approving it would be kept.

**Q And when you say, "this sort of document," you are referring to --**

A Like Plaintiffs' 7, yes. Whether or not the handwritten documents that fed into a system to create, you know, the final approving document or approvable document are kept, I don't know. To me it would not be unusual to do that but that doesn't mean that they had -- that they actually do that.

**Q And do you know if CBP has a policy that they keep those records? When I say, "those**





**WAYNE A. COLEMAN**

**records," I mean the handwritten records.**

A No, I don't know that.

MR. SWEENEY: We would make a request at this time that those records be produced. Indeed, they should have been produced if they are available within the original document request. So we would make the request that that search is made and those original handwritten documents be produced.

MR. RAYEL: Well, we will review the original document request. If they fall within that, then they would -- and there is no other objection, they would be. If not, we would ask that you put that in a formal discovery request.

MR. SWEENEY: Okay. Let me know if you don't think it falls within there. I can't imagine how it wouldn't but if you think it doesn't fall within there, let me know, or if they don't exist, let me know, so we don't have to go to any undue effort, either you, me, or Mr. Pease, to search after documents that don't exist. If they do exist, I think they are pretty relevant and would be discoverable.

MR. RETTINGER: Do you want to take a short break?

WAYNE A. COLEMAN

THE WITNESS: Certainly.

MR. SWEENEY: Let me just think if we are at the last place here. I have just a couple of questions for him with respect to whether these documents are FLETC. Can you -- just a couple of minutes?

MR. RETTINGER: Sure.

BY MR. SWEENEY:

**Q Do you know if there is a policy that the handwritten time records be kept at FLETC?**

A I don't know that for a fact but it would be reasonable to assume that's correct.

**Q Okay. And if they were kept there, do you know where they would be kept?**

A That becomes a little trickier in this particular case. Don't forget that these people were actually under the control of the Border Patrol Academy in Charleston, even though they were attending classes at FLETC in Glencoe. In the meantime, the Border Patrol Academy has moved to Artesia, New Mexico, and I don't know how things happen in your world but in our world sometimes when people move, files get thrown out because we need to lighten the load and have smaller amounts of files





WAYNE A. COLEMAN

to keep. So it is possible that they could be in any of three places -- well, any of two places, I guess, at this point. They possibly could be at FLETC but it is possible they are with the Border Patrol Academy in Artesia.

**Q An do you know if a search for those has been made either at FLETC or at the Border Patrol Academy in Artesia?**

A I really don't know.

MR. SWEENEY: We would make the same request. If those documents do exist, either at FLETC or at the Border Patrol Academy in Artesia, that they be produced. If you are claiming a privilege to them or don't think that they are within the initial document request, please let me know and we will promulgate another document request, but I think they pretty clearly fall within that.

Now is a good time to take a break.

THE WITNESS: Okay.

(Recess.)

BY MR. SWEENEY:

**Q Mr. Coleman, when we were -- before we took the break, you were talking about, I think, a**





WAYNE A. COLEMAN

**CBP training academy in South Carolina that moved to New Mexico?**

A No, I was talking about the Border Patrol Academy that was in Charleston, South Carolina, from about 1996 until about 2004 and it then moved in 2004, I think it was October of 2004, to Artesia, New Mexico. And that's A-r-t-e-s-i-a.

**Q And is that academy still up and running?**

A Yes, it is.

**Q And does that academy do basic training for Border Patrol agents?**

A As I understand it, yes.

**Q Why were the plaintiffs in this case doing their basic training at the FLETC if the Border Patrol had its own academy for basic training?**

A Since we were not brought into the discussions about putting those classes down there, I can't really say for sure. My speculation would be that, like other parts of Customs and the entire Department, we were trying to get people out onto the front lines quicker. This was also a period of time when the Border Patrol had been given a Congressional mandate to increase the number of Border Patrol agents on the line, so there was an





WAYNE A. COLEMAN

emphasis on getting them through training quickly. Obviously, they were using Charleston to the maximum they felt they could and, apparently, they found some space at FLETC and, therefore, able to utilize that to get the training done, as well. So, again, kind of speed the process up.

**Q And do you know if the four classes at issue here are the only classes of Border Patrol agents that did basic training at FLETC?**

A As far as I know, yes.

**Q And do you know if the Border Patrol Academy in South Carolina ever conducted basic training on a six-day a week schedule?**

A No, they did not.

**Q And do you know if the Border Patrol Academy in New Mexico ever conducted basic training on a six-day-a-week schedule?**

A Not to the best of my knowledge.

**Q Other than the Border Patrol Academy, either when it was in South Carolina or its present location in New Mexico, and the FLETC, is there anywhere else that Border Patrol agents have performed basic training since 2001?**

A No.

WAYNE A. COLEMAN

training, we communicated with the Office of Border Patrol and made it very clear to them that there had, in fact, been a change in OPM's interpretation of the Fair Labor Standards Act and that if these employees had attended a regularly scheduled sixth day of training while they were at the basic training, wherever it was held, but in this case at FLETC, then they were entitled to be paid overtime, FLSA overtime, for that time. And the Office of Border Patrol indicated that once they understood that, that that was their intention, that they wanted to do that, that they felt it was the right thing to do, it is the legal thing to do. And after that, it simply, apparently, took quite a bit more time than I thought but it took some time then to get that payment out and made to the employees.

**Q And, indeed, that payment wasn't made until the Government was sued over this issue; is that right?**

A I believe that the -- well, clearly, by the time the payment was made, the lawsuit had already been filed, yes.

**Q Okay. In fact, two lawsuits had been filed; is that right?**





**WAYNE A. COLEMAN**

A That's right.

**Q The Barth lawsuit and the Porta lawsuit; is that right?**

A That's correct.

**Q Were you involved in the settlement negotiations in the Barth lawsuit at all?**

A No, I was not.

**Q Do you know if the Government was trying to settle that lawsuit for the amount that they eventually ended up paying?**

A No, I really can't answer that.

**Q You said just a moment ago that, "At one point, we started receiving calls from Border Patrol agents." Who were you referring to when you said, "we"?**

A Alethea and I, Alethea Smalls and myself.

**Q And when was that?**

A To the best of my knowledge, it would have been the summer of 2004. So apparently it occurred after the training was pretty much completed for most of these people.

**Q And do you remember the first time you got a call regarding this?**

A No, that specific date, I do not, no.





WAYNE A. COLEMAN

**Q Did you take any notes when those calls came in?**

A No.

**Q Did you receive any of those questions by e-mail?**

A It is possible.

**Q Did you make a search for any documentation with respect to those requests?**

A Well, we run into the same problem that we did when we talked about Moreno. I'm no longer at Customs and Border Protection, so if my e-mail account has -- continuous to exist, they might be there but I have no access to it since I am now with the Department of Homeland Security.

**Q Okay.**

A But I think it is entirely possible that they may have extinguished whatever files I had there at that time.

**Q Do you know that for a fact?**

A No, I don't.

**Q And did you make any search of your e-mail account for any correspondence from employees from the Border Patrol to you regarding this issue of pay for the sixth day of basic training?**





**WAYNE A. COLEMAN**

A I -- I know -- no, I did not, because I am now at the Department of Homeland Security. That's the only account that I have access to and I did not receive any questions from Border Patrol agents once I had moved to the Department. All the questions, if they came by e-mail to me from the Border Patrol agent, would have been when I was at Customs and Border Protection. I no longer have access to that account and have not since the summer of 2005.

**Q And do you know if anyone at Customs and Border Protection has made a search of your e-mail account?**

A No, I don't.

MR. SWEENEY: Okay. We would make a request that if that search has not been done, that it be done, and, indeed, if the search has been done, let us know so we don't have to go for discovery of it, but, of course, if anything does or did come from that search, it would be highly relevant and material and should have been produced with the original document request. Make the request that you either do the search or give us a representation that you have done it.

MR. RAYEL: Again, that will have to be

WAYNE A. COLEMAN

part of a formal document -- formal unobjectionable document request.

MR. SWEENEY: It is already part of a formal document request. So if there is going to be an objection to producing that information, it should be raised specifically.

As I make these requests, I would ask that at the end of the transcript that you mark all those spots that I made the requests for information. So I should have told you that earlier. I apologize.

BY MR. SWEENEY:

**Q Do you know if Ms. Smalls -- is Ms. Smalls still with the Customs and Border Protection?**

A Yes, she is.

**Q Do you know if Ms. Smalls made a search of her e-mail account for any possible communications from Customs an Border Patrol people?**

A I know that in talking with her a couple of weeks ago in preparation for this, she indicated that she had been through her files looking for documents relevant to the case.

**Q And do you know, did she say that she had looked through her e-mail files?**

A She didn't say that specifically but I





WAYNE A. COLEMAN

assume that, based on the conversation, that she looked through whatever places she might have found information.

**Q And if you had received -- do you ever remember receiving an e-mail from a Customs and Border Patrol person regarding this issue?**

A Not specifically. I can't say that, no.

**Q If you had received an e-mail from a Customs and Border Patrol person, is it possible that you would have forwarded it on to Ms. Smalls?**

A It is possible but unlikely.

**Q And why unlikely?**

A Because she was getting them, also. I mean we both received calls and e-mails from people and we would simply say that we had -- or make a note that we had made another one, that in a verbal note, we would talk with each other that we had received yet another one today from whoever the person's name was and that clearly we would need to remind the folks at Border Patrol that they needed to get moving on this.

**Q And when you received an e -- well, first of all, do you know that Ms. Smalls received e-mails on this issue?**





WAYNE A. COLEMAN

A I'm assuming she did. We certainly talked about it.

**Q And when you received an e-mail on the issue, would you respond to the e-mail?**

A Yes.

**Q And would you keep a copy of that response in any file other than your e-mail account?**

A No.

MR. SWEENEY: And we would make a request that either Ms. Smalls' account, e-mail account, be searched, or if it has, that a representation be made that it has been searched. Again, those documents -- those searches would fall within the original document request and certainly the documents would be very relevant. If you represent it's been made and nothing has come up, that's fine. If it hasn't been made, we ask that you make it. If you have a specific objection to making the search, providing the information, we ask that you raise it.

BY MR. SWEENEY:

**Q Is there anyone else that would have received inquiries from Customs and Border Patrol employees regarding the sixth day of training and payment for that day?**





WAYNE A. COLEMAN

A The Border Patrol agents might have contacted a number of different people. I would be speculating to try and figure out who they might be but I -- again, I think we talked about it when we did the Moreno deposition. It would not be unusual for a student or an employee to check with their supervisor, check with their timekeeper; they may even have raised it up the chain of command to somebody here in Washington but I would be speculating to say who that would be because I have no knowledge of them.

**Q And before you arrived at CBP, where would the request have gone within CBP from an employee?**

A If there had been any, and I can't say with any sure knowledge that there were, but if there had been any, they probably would have gone to Ronelle, I mean that would be the logical place for them to go.

**Q Because she was the only one in the compensation group at that point; is that right?**

A That's correct.

**Q So you were receiving these calls in the summer of 2004; is that right?**

A That's correct.

WAYNE A. COLEMAN

**Q But these classes were training back in 2003 and training for six days and not getting paid; is that right?**

A That's correct.

**Q So if anyone had a question about that, it is possible, at least, that they would have gone to Ronelle Rotterman as the only person in the compensation group at CBP; is that right?**

A It is possible.

MR. SWEENEY: Make a request at this point that Ms. Rotterman's e-mail and also her file for any notations or documentation regarding the issue be searched. Again, this would all fall within the original request. If you have made the search, please represent that. If you haven't made the search, we would ask that it be done and anything produced. If you are going to raise a specific objection to it, we would ask that you raise the specific objection so that we can bring it to the judge and get it resolved as quick as possible.

MR. RAYEL: Essentially, we will be following the Rules of Civil Procedure on everything.

MR. SWEENEY: Well, if you have already





WAYNE A. COLEMAN

followed them and produced the documents or made the searches, that's fine. If you haven't followed them to date, though, I think you have a responsibility to let us know, so that if you are going to raise something or if you have overlooked something, that we can clear it up; otherwise, we have got to go to the judge and I don't think she wants us to waste her time on this. Something should have been done.

BY MR. SWEENEY:

**Q Going back to the exhibit that's marked Porta Number 8, do you know if this document would have been produced -- would have been sent to the employee?**

A I don't know that for sure. This appears to be an on-line system and it may be that the -- because the National Finance Center, which I think did the payment, has their own on-line system. I would not be surprised if this is screen print from that system and, in that case, the employee would have access to this directly. Each person has their own account on the system if they are paid by the National Finance Center.

**Q So employees would be able to access these screens themselves; is that right?**





WAYNE A. COLEMAN

A That's the way I understand it, yes.

**Q Okay. And when CBP made the payment to the plaintiffs in what seems to be July of 2003 -- I'm sorry -- July of 2006, do you know what that payment was comprised of?**

A As far as I know, it is -- it was made of the overtime for the six days of training -- the sixth day of training that each one of the employees attended and interest on that payment.

**Q And do you know how the overtime was calculated for each of the employees?**

A Following the standard FLSA overtime calculations, as far as I know, which would be time-and-a-half.

**Q So they would have used the salary to determine an hourly rate; is that correct?**

A That's correct.

**Q And then that hourly rate would have been multiplied by 1.5 to determine an overtime rate; is that correct?**

A That's correct.

**Q And then interest was paid in addition to that; is that correct?**

A That's correct.





WAYNE A. COLEMAN

**Q Do you know what the rate of interest that was paid was?**

A I think it is around 10 percent but I'm not sure. There is a standard federal rate that's established each year by the U.S. Office of Personnel Management for backpay payments and that would have been used.

**Q And do you know if that's publicly available?**

A Yes. It is on the OPM Web site.

**Q Do you know, Mr. Coleman, if -- well, first of all, sorry. Strike that.**

**If someone was no longer employed by CBP when they received this payment, would they still have access to these screens?**

A No.

**Q Mr. Coleman, do you know how these payments were made to the plaintiffs?**

A The normal way for those people who were still employed by Customs and Border Protection or, actually, by the Federal Government would be through electronic transfer of funds. For people who are no longer working for us, they would normally be through a paper check.

WAYNE A. COLEMAN

**Q And if somebody was working for the Government but didn't have direct deposit, would they be paid by check, too?**

A There is almost nobody in that category anymore. The Government encourages us to have an account that they can make an electronic funds transfer to.

**Q And in the instance that they -- you say there is almost no one, but in the instance that there is someone, is it possible that they would be paid by check, as well?**

A It is possible but I would think that that percentage would be almost out of sight.

**Q And do you know if there was any communication with the -- if there was any communication that went along with the payment to the plaintiffs?**

A I believe there was. I know in speaking with Ms. Smalls, that she showed me a draft of a document that she put together for use by the Border Patrol to go out to them when the payment was made to explain why the payment was being made.

**Q And when did she show you that draft?**

A Couple of weeks ago when I was talking





WAYNE A. COLEMAN

with her.

**Q Okay. And was that draft --**

MR. SWEENEY: We would request production of that draft. That, again, is certainly something that would fall within the ongoing discovery obligations.

THE WITNESS: Now, I have to say that she was not aware whether or not the letter had been used but she was requested to draft one and did so and then passed it onto the Border Patrol.

MR. SWEENEY: Okay. Well, we would certainly ask if anything went from the Border Patrol to the plaintiffs or to the class explaining what the payment was for, that that be produced. Again, clearly within the document request. I don't believe it's been produced. I haven't seen a copy of it. It hasn't been in any of the recent productions. If you --

MR. RETTINGER: I assume if any letter went out, your clients would have a copy.

MR. SWEENEY: Well, we have not seen anything, so if a letter went out either to our clients or to the class, we have not gotten it, so it is possible that it didn't go out. Possible that





WAYNE A. COLEMAN

it wasn't received. I don't know. And, indeed, it may be that -- I would imagine you probably wouldn't have sent it to our clients without running it by us first. That would be a communication with plaintiffs. But, in any case, it is certainly, you know, a document that's relevant, falls within the document request, and should be produced. If you are going to raise a specific objection to it, please let us know. Please let us know if it did go out or it didn't go out. He has seen a draft of it. We are happy to take a representation if it didn't go out that it didn't go out. That's fine. But Mr. Coleman has seen a draft. If it did go out to our plaintiffs or the class, it would be relevant and we would ask that you produce it.

BY MR. SWEENEY:

**Q In the draft that you saw from Ms. Smalls, did it explain the method of calculating the payment to the class members?**

A I can't say that I read it over and memorized it but I think it kind of generally talked about the fact that it was FLSA overtime and, therefore, would be calculated at time-and-a-half, time of the employee's basic pay.





WAYNE A. COLEMAN

**Q Did it indicate that there would be interest added on top of that?**

A I believe there was discussion of that, yes.

**Q And did it indicate why -- well, were liquidated damages paid, as well?**

A No.

**Q Did the communication indicate why liquidated damages were not being paid?**

A No.

**Q Did it make any reference to liquidated damages?**

A None whatsoever. As we talked about under the Moreno case, typically, when payments like this are made, they are made under the Backpay Act, and the Backpay Act provides for paying of interest. The only time I have ever seen liquidated damages paid is if a court has made a decision and issued an order to do so.

**Q And it is your understanding that the CBP does not have the authority to pay liquidated damages without a court order?**

A That would be my understanding.

**Q I would like to show you a document that's**

WAYNE A. COLEMAN

**telling CBP's Human Resources people about it?**

A I am saying that they decided to send some people to FLETC for -- who was working on a sixth day of training and, so far as I know, they did not contact the Human Resources office and ask them whether or not that would have an impact on the employees' compensation.

**Q Let me try to get this straight, then. So who made the decision just to make them work six days and not pay them for it without going to the compensation folks?**

A I would assume the chief in the Border Patrol but I can't say exactly who the person was who made that decision.

**Q And who was the chief in the Border Patrol?**

A I can probably get you that name. I don't have it off the top of my head.

**Q In your experience, is that normal practice, that people would -- that a group like Border Patrol would make a decision to have people work a sixth day and not contact the compensation people to see if they had to pay them?**

A Well, I think if you will remember our





WAYNE A. COLEMAN

conversations during the deposition for the Moreno case that you asked very similar questions about the folks who went to FLETC for training there and we did not know, so they did not contact us.

**Q Well, but this training took place after everybody knew. Ms. Spero knew, Mr. Smith knew, Ms. Rotterman knew, OPM knew, ICE knew, CIS knew and OPM had posted this on its Web site; is that right?**

A The posting took place in about July of 2003, so if the training took place after that time, yes. The people that you just mentioned did know because they were involved with people who were doing that kind of training. Again, to the best of my knowledge, nobody in the Human Resources office was aware that Border Patrol had determined that they were going to send some people to FLETC for the sixth day of training.

**Q And do you know if the people that sent people to FLETC for the sixth day of training knew that there was an issue as to whether or not you had to pay people for that sixth day?**

A I can't say that for sure, no.

**Q Do you know that they didn't know that?**





WAYNE A. COLEMAN

A I know that they did not communicate with the Human Resources office and, therefore, the -- the Human Resources office was not able to brief them on the fact that this issue was under discussion.

**Q Do you know if FLETC was aware of the issue as to whether or not you had to pay for the sixth day of training?**

A The staff -- the FLETC staff itself, yes, was, clearly.

**Q And do you know when they became aware?**

A Since they have their own Human Resources office, I'm assuming they were following the issues, as were all of the agencies.

**Q So do you know if any of the FLETC Human Resources folks were sent Melissa Allen's e-mail that's Plaintiffs' Number 10?**

A I don't recognize any of those names as being from FLETC but I have to tell you that I don't know at this -- in March of 2003 who the director of Human Resources was, so that person's name may be there and I simply don't recognize it.

**Q Is it reasonable to assume that people at the FLETC were aware of the issue of paying for the**





WAYNE A. COLEMAN

**sixth day of training in March of 2003?**

A I think they were aware of the issue, yes.

**Q Let me show you a document that we marked in the Moreno case as Plaintiff's Exhibit Number 11 and perhaps we can mark as Porta Number 11.**

**(Porta Plaintiffs' Deposition Exhibit 11 identified.)**

**BY MR. SWEENEY:**

**Q Do you remember this document that we talked about during the Moreno case?**

A Yes, I do.

**Q And this document went out as a DHS broadcast; is that right?**

A That's correct.

**Q Would this document have gone to Ronelle Rotterman?**

A I can't say that for sure. It would depend on how the e-mail list was constructed. The purpose of this was to get to -- to the best of my recollection, anyway, was to get to the Legacy INS employees to let them know or to talk about the issue of the sixth day of training with them and let them know where we were at that point. That e-mail -- what I am saying is the e-mail list may

WAYNE A. COLEMAN

have been constructed in a way that Ronelle was not part of it.

**Q Although the body of the e-mail isn't limited to Legacy INS people, is it?**

A No.

**Q It just talks about having to pay overtime for the sixth day of training at the FLETC; is that right?**

A That's correct.

MR. SWEENEY: This has been redacted and we talked about the redaction last time and I think you made the representation that Mr. Tingley's name was on it.

MR. RETTINGER: That is correct.

MR. SWEENEY: Certainly for the purposes of this case, it is very important to know who at CBP was aware of it, specifically, if there was anyone at Border Patrol that was on that DHS broadcast. You have not given us all the names in the people that were part of this but, you know, I think it is very relevant and, indeed, critical as to whether or not this made the rounds at CBP, including anyone at Border Patrol. So we would make the request and, indeed, think that that request is





WAYNE A. COLEMAN

an integral part of the initial Porta document request that you indicate on here who from CBP and who from Border Patrol received the document, who from CBP, including who from Border Patrol, received the document. If you are going to raise an objection to that, please raise the objection for us so we can bring it to the judge and get it cleared up as quickly as possible. But I think that's part of the original document request.

THE WITNESS: Let me just clarify. This is something that we on the ICE or INS compensation policy staff drafted and I think you can tell from the last couple of lines on -- in the last paragraph that we are talking about those people that we understood to be Legacy INS employees who were -- had attended a sixth day of training. Again, at this point in time, we were not aware and, in fact, in May of 2003, it had not occurred yet, that any Border Patrol employees had attended that kind of training. Their academy was somewhere else working on a different schedule. So I think it would be highly unlikely that, however the e-mail list was constructed, that this would have gone to anybody in the Border Patrol. And it is not likely, although





WAYNE A. COLEMAN

it is more possible, that it might have gone to Ronelle Rotterman. So I -- but I think you need to focus on the fact that this was something we drafted to let the Legacy INS employees who we knew had been to FLETC for basic training to talk about where we were in the process of trying to find out whether or not they could be paid.

BY MR. SWEENEY:

**Q This is dated May 6th of 2003; is that right?**

A That's correct.

**Q It is a DHS broadcast; is that right?**

A That's correct.

**Q Was CBP part of DHS at that date?**

A They were.

**Q Was Border Patrol part of DHS at that point?**

A Yes, they were.

**Q Is it possible that people had had been Legacy INS employees, were then working at Border Patrol?**

A In fact, since Border Patrol was or had come from the Immigration and Naturalization Service, they were considered Legacy INS employees





WAYNE A. COLEMAN

but, again, they had not been attending basic training at FLETC so we did not feel it necessary to notify those employees of the issue since we --

**Q So if someone had been an INS person who had trained at FLETC for six days a week, is it possible that they would have transferred to the Border Patrol?**

A It is possible.

**Q Is it possible they would have received this DHS broadcast because they had trained at FLETC for six days?**

A I would be -- that's -- I really have no way of answering that question.

**Q Do you know who Frances -- K. Frances Dolen is?**

A Yes, I do.

**Q Who is K. Frances Dolen?**

A I think we talked about this during Moreno. She was the deputy chief human capital officer for the Department of Homeland Security.

**Q And in comparison to Melissa Allen, where did she fall in the hierarchy chain?**

A She would have worked for Melissa Allen.

**Q Okay. So we might be able to save some**

WAYNE A. COLEMAN

throughout the year for ICE.

**Q So this wasn't the --**

A This is not OMB -- not OMB.

**Q Okay. So there was a budget office for ICE --**

A Yes.

**Q -- at this point within CBP; is that correct?**

A Within ICE.

**Q It was within ICE.**

A Right.

**Q I'm sorry. Yes. Within ICE. And ICE was within DHS; is that right?**

A That's correct.

**Q And was there an Office of Budget within DHS directly?**

A Yes.

**Q Okay. And do you know if the Office of Budget within DHS knew about the chance that overtime might have to be paid to people that trained for a sixth day at FLETC?**

A I don't, no.

**Q Would an interpretation requiring that those people get paid backpay for the overtime have**





**WAYNE A. COLEMAN**

**affected the DHS budget?**

A Only to the extent that ICE was not able from its own appropriations to cover the cost and eventually the DHS budget office did facilitate the meeting of the three components and determining a formula for making the payments.

**Q And the three components being --**

A CIS, Citizenship and Immigration Services, ICE, and CBP.

**Q And at this point in March of 2003 when you wrote this, was it clear as to where the funds to pay any backpay liability would come from?**

A No. And that was one of the reasons for making the contact.

**Q Do you know if anyone was in contact with DHS's Office of Budget regarding this issue?**

A I don't know.

**Q If you take a look at the back page here which is marked Moreno 188, was this your estimate -- well, can you explain to me what this is?**

A Yes. It appears to be an estimate of the cost.

**Q Cost of what?**





**WAYNE A. COLEMAN**

A Of making the back payment.

**Q And did this cost include any interest payment?**

A It doesn't look like it. This was -- it looks like just the basic overtime payment was included here.

**Q So this wouldn't have included any liquidated damages calculation, would it have?**

A No, it would not have.

**Q And do you remember if you made these estimates -- remember what the rate you made -- strike that.**

**In calculating these estimates, did you use time-and-a-half as the hourly rate for the overtime hours?**

A Yes.

**Q And it seems as if in the bottom left-hand corner you put certain assumptions in there and the third one says, "I used the average of 15 training." Do you know what that means?**

A No. Since it appears that some of this -- some of the text is missing, I really don't.

MR. SWEENEY: If some of the text is missing, this is what was provided to us, so --





WAYNE A. COLEMAN

MR. RETTINGER: To the best of my knowledge, this is exactly what we have.

MR. SWEENEY: Well, we would make a request that you go back and take a look to see if it is. This was PDF'd to me from Mr. Pease, so it is possible it got cut off or it is possible --

MR. RETTINGER: I will check. I have the original as it was sent to me. I will check again but to my knowledge this is exactly what I have got.

BY MR. SWEENEY:

**Q Okay. So, Mr. Coleman, as of this date -- well, as of March 2003, does this show that your estimate as to the backpay liability was approaching $10 million?**

A Yes.

**Q And this didn't include any interest payment; is that correct -- as we said before; is that right?**

A That's correct.

**Q Okay. And this also did not include liability for the classes that trained after March of 2003 and were not paid overtime for the sixth day; is that right?**

A I believe that's correct.