# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARTURO MORENO, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05-142C |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | (Judge Firestone) |
| | ) | |
| | ) | |
| Defendant. | | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its Cross-Motion for Summary Judgment.[1]

## I. Background

1. Plaintiffs are current and former employees of the former Immigration and Naturalization Service ("INS") who attended training at the Federal Law Enforcement Training Center ("FLETC") between January 2002 and August 23, 2003. Pl. F., ¶¶ 1-2.

2. Federal regulations state that immigration law officers (as defined in 8 C.F.R. § 103.1(b)) are required to attend basic law enforcement training before being permitted to perform basic functions of their jobs, namely: "to patrol the border," 8 C.F.R. § 287.5(b); "to arrest," 8 C.F.R. § 287.5(c); "to conduct searches," 8 C.F.R. § 287.5(d); "to execute warrants," 8 C.F.R. §

[1] The plaintiffs' Proposed Findings of Uncontroverted Fact will be cited as "Pl. F. ¶ _." The plaintiffs' exhibits will be cited as "Pl. Ex. _." The plaintiffs' motion will be cited as "Pl. Mot. _." Our Proposed Findings of Uncontroverted Fact will be cited as "Def. F. ¶ _." The exhibits set forth in the Appendix filed herewith will be cited as "Ex. _." Page numbers from the Appendix will be referred to as "A_."

287.5(e); to use "non-deadly force," 8 C.F.R. § 287.8(a)(1); or to use "deadly force," 8 C.F.R. § 287.8(a)(2).

3. Until they successfully completed the basic training course, the plaintiffs would not have been able to perform the full responsibilities of journeyman officers or agents, such as patrolling the border, making arrests, conducting searches, or executing warrants. 8 C.F.R. § 287.8(a).

4. The INS required Plaintiffs to attend "basic immigration law enforcement training" at FLETC. Pl. F. ¶¶ 2, 9; Ex. 32 (Deposition of Wayne Coleman pursuant to Rule of the Court of Federal Claims 30(b)(6), Nov. 2-3, 2006), 45:13-19.

## II. <u>FLETC Implements A Six-Day Training Schedule</u>

5. After the events of September 11, 2001, various federal law enforcement agencies made a concerted effort to increase the number of law enforcement officers available for immediate duty. Ex. 11(Government Accountability Office ("GAO"), Federal Law Enforcement Training Center: Capacity Planning and Management Oversight Need Improvement, GAO No. 03-736 (July 24, 2003)), A144.

6. In an effort to put law enforcement employees through basic training more quickly and enable FLETC to train more law enforcement employees in a shorter period of time, FLETC replaced its schedule of five eight-hour days per week with a schedule of six eight-hour days per week. Prior to this time, FLETC had not operated a six-day schedule. Ex. 1 (Declaration of Wayne Coleman, Dec. 20, 2007), ¶ 8; Ex. 28 (Declaration of Wayne Coleman, Sep. 24, 2004), ¶ 3; Pl. F. ¶ 3; Ex. 11 (GAO Report), A144.

## III. The Regulatory Framework Governing Wages Paid To Federal Employees

7. The Fair Labor Standards Act sets forth standards for overtime wages. 29 U.S.C. § 201, et seq.

8. The Office of Personnel Management ("OPM") is the federal agency charged with promulgating regulations regarding the application of FLSA to federal employers and with providing guidance to federal employers regarding personnel matters, including pay. 29 U.S.C. § 204(f); 5 C.F.R. § 551.102(a); Ex. 5 (Declaration of Jerome D. Mikowicz, Dec. 19, 2007), ¶ 3.

9. One means by which OPM provided official guidance to federal agencies regarding personnel matters, including pay, was its website, www.opm.gov. Ex. 5 (Mikowicz Decl.), ¶ 4.

10. The Federal Personnel Manual ("FPM") was published by OPM (and its predecessor the Civil Service Commission) as one means of providing official guidance to federal agencies regarding personnel matters, including pay. Ex. 5 (Mikowicz Decl.), ¶ 5.

11. On December 31, 1993, OPM issued a "FPM Sunset Document", which abolished the FPM but retained certain sections as "material that is being retained because it contains process instructions, critical case law, ensures consistency of action throughout Government, or authorizes agency action." Ex. 6 (FPM Sunset Document), A21; Ex. 5 (Mikowicz Decl.), ¶ 6.

12. Pay personnel at various federal agencies often consulted the FPM letters in making determinations regarding pay, even after the publication of the Sunset Document. Ex. 5 (Mikowicz Decl.), ¶ 7.

13. One of the "provisionally retained" FPM letters was FPM Letter 551-17, entitled "Time Spent in Training as Hours of Work Under FLSA" (January 28, 1981). Pl. Ex. 13 (labeled "retain until superseded"); Ex. 5 (Micowicz Decl.), ¶ 8.

## IV. INS Pay Personnel Determine That The Fair Labor Standards Act Does Not Authorize Overtime Wages For Entry-Level Training

14. After FLETC implemented its six-day schedule, Wayne Coleman, INS pay specialist, was asked to determine whether overtime wages were required to be paid to trainees attending training six days a week. Ex. 32 (Coleman Depo.), 53:7-25, 58:14-59:9.

15. At the time, Mr. Coleman had seventeen years of experience as a pay specialist for federal agencies. Ex. 1 (2007 Coleman Decl.), ¶ 6; Ex. 32 (Coleman Depo.), 13:17-14:14. At INS, he reported directly to the Chief of Compensation Policy. Ex. 1 (2007 Coleman Decl.), ¶¶ 4-5; Ex. 32 (Coleman Depo.), 20:8-14.

16. In determining whether overtime wages were required to be paid to trainees attending training 6 days a week at FLETC, Mr. Coleman consulted the FLSA statute, the governing regulations promulgated by OPM, and guidance published by OPM on its website and in FPM Letters. Ex. 1 (2007 Coleman Decl.), ¶ 10; Ex. 32 (Coleman Depo.), 60:12-62:9.

17. In determining whether overtime wages were required to be paid to trainees attending training 6 days a week at FLETC, Mr. Coleman consulted the provisionally retained FPM Letter 551-17, entitled "Time Spent in Training as Hours of Work Under FLSA." Ex. 1 (2007 Coleman Decl.), ¶ 11; Ex. 32 (Coleman Depo.), 62:10-14.

18. FPM Letter 551-17 states "time spent in training outside regular working hours is compensable as hours of work under the FLSA if certain stipulated criteria are met." FPM Letter 551-17 also states, "These criteria are specified in section 551.423 of the regulations in Part 551 of title 5, Code of Federal Regulations." Pl. Ex. 13.

19. The regulation specified in FPM Letter 551-17, namely, 5 C.F.R. § 551.423(a)(3), states:

> Time spent in . . . entry level training . . . outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods.

20. At the time Mr. Coleman consulted FPM Letter 551-17 and 5 C.F.R. § 551.423(a)(3), he understood "regular working hours" to refer to the forty-hour work week. Ex. FF (Coleman Depo.), 78:12-20. He did not consult 5 C.F.R. § 551.421. Ex. 1 (2007 Coleman Decl.), ¶ 14; Ex. 32 (Coleman Depo.), 102:14-17.

21. Mr. Coleman also consulted 5 C.F.R. § 410.402. Ex. 1 (2007 Coleman Decl.), ¶ 15; Ex. 32 (Coleman Depo.), 208:23-210:24. This regulation states in part:

> (a) Prohibitions. Except as provided by paragraph (b) of this section, an agency may not use its funds, appropriated or otherwise available, to pay premium pay to an employee engaged in training by, in, or through Government or non-government facilities.
>
> . . .
>
> (b)(7) Agency exemption. An employee given training during a period not otherwise covered by a provision of this paragraph may be paid premium pay when the employing agency has been granted an exception to paragraph (a) of this section by the U.S. Office of Personnel Management.
>
> . . .
>
> (d) Regulations governing overtime pay for employees covered by Fair Labor Standards Act (FLSA) during training, education, lectures, or conferences are found in §551.423 of this chapter. The prohibitions on paying premium pay found in paragraph (a) of this section are not applicable for the purpose of paying FLSA overtime pay.

## V. OPM Personnel Independently Come To The Same Conclusion And Provide Guidance Accordingly

22. In January of 2002, Vicki Draper, Lead Compensation Specialist of the Pay and Leave Administration Group, Center for Pay and Leave Administration (OPM) received a phone call from Gary Wilson of the U.S. Forest Service concerning the 6th day training proposed by FLETC. Ex. 30 (Deposition of Vick L. Draper, Nov. 30, 2006), 91:25-92:6.

23. In determining whether overtime wages were authorized for FLETC trainees, Ms. Draper consulted the FLSA regulations promulgated by OPM and her knowledge of prior OPM guidance, including FPM Letter 551-17. Ex. 30 (Draper Depo.), 93:17-20, 103:4-19.

24. In particular, Ms. Draper consulted 5 C.F.R. § 551.423(a)(3), which stated: "Time spent in . . . entry level training . . . outside regular working hours shall not be considered hours of work, provided no productive work is performed during such periods." Ex. 30 (Draper Depo.), 96:20-97:8.

25. In January 2002, it was the "long-standing interpretation" of some in OPM that "any hours outside of the 40-hour work week for entry level training was not part of their regular work schedule . . . [and] . . . was outside the regular work hours." Ex. 30 (Draper Depo.), 103:4-13, 112:18-24. 21; Ex. 34 (Deposition of Jerome D. Mikowicz, Jan. 11, 2007), 146:11-22.

26. Ms. Draper also consulted 5 C.F.R. § 410.402(a). Ex. 30 (Draper Depo.), 95:5-7. That regulation, promulgated by OPM, states in part:

> (a) Prohibitions. Except as provided by paragraph (b) of this section, an agency may not use its funds, appropriated or otherwise available, to pay premium pay to an employee engaged in training by, in, or through Government or non-government facilities.
>
> . . .
>
> (b)(7) Agency exemption. An employee given training during a period not otherwise covered by a provision of this paragraph may be paid premium pay when the employing agency has been granted an exception to paragraph (a) of this section by the U.S. Office of Personnel Management.
>
> . . .
>
> (d) Regulations governing overtime pay for employees covered by Fair Labor Standards Act (FLSA) during training, education, lectures, or conferences are found in §551.423 of this chapter. The prohibitions on paying premium pay found in paragraph (a) of this section are not applicable for the purpose of paying FLSA overtime pay.

27. Based upon her review of the applicable regulations, and her knowledge of OPM guidance, Ms. Draper concluded that overtime wages were not authorized for FLETC trainees. Ex. 30 (Draper Depo.), 93-109, 109:10-16.

28. Ms. Draper then consulted two of her supervisors, namely, Jo Ann Perrini and Bryce Baker. Ex. 30 (Draper Depo.), 96:20-97:8, 108:24-109:9.

29. When Ms. Draper consulted Ms. Perrini and Mr. Baker, they agreed with her conclusion that overtime wages were not authorized for FLETC trainees. Ex. 30 (Draper Depo.), 108:24-109:0, 114:7-115:1; Ex. 4 (Declaration of Bryce Baker, Dec. 19, 2007), ¶ 5.

30. Ms. Draper then advised Mr. Wilson that overtime wages were not authorized for FLETC trainees because the sixth day of training did not constitute "hours of work" under 5 C.F.R. §551.423, and 5 C.F.R. § 410.402 did not permit payment of overtime aside from that permitted by FLSA except with an exemption. Ex. 30 (Draper Depo.), 116:24-117:3.

31. Ms. Draper also received a similar inquiry from the Department of State and provided similar advice, namely that overtime wages were not authorized for FLETC trainees because the sixth day of training did not constitute "hours of work" under 5 C.F.R. §551.423 and 5 C.F.R. 410.402 did not permit payment of overtime aside from that permitted by FLSA except with an exemption. Ex. 30 (Draper Depo.), 118:5-11.

32. Other agencies, including the Department of State, the Bureau of Land Management, the Department of Housing and Urban Development, and the United States Department of Agriculture Forest Service, independently came to the same conclusion, namely that overtime wages were not authorized for FLETC trainees because the sixth day of training did not constitute "hours of work" under 5 C.F.R. §551.423. Ex. 7 (Declaration of Brenda Evenski,

Department of State); Ex. 8 (Declaration of Felicia J. Probert, Bureau of Land Management); Ex. 9 (Declaration of Lester Davis, Office of the Inspector General of the Department of Housing and Urban Development); Ex. 10 (Deborah A. Rigden, United States Department of Agriculture, Forest Service).

## VI. INS Seeks Exemption In Order To Permit Compensation Of FLETC Trainees For Sixth Day Of Training

33. Prior to the creation of the Department of Homeland Security, INS was a component of the Department of Justice. Ex. 20 (Department of Homeland Security Memorandum), A251.

34. Because INS had determined that FLSA did not authorize overtime wages for FLETC trainees, INS sought an exemption from 5 C.F.R. § 410.402 to permit it to compensate FLETC trainees for the sixth day of training at FLETC. Pl. Ex. 18.

35. INS sought the exemption on April 24, 2002, by way of a memorandum from the Executive Associate Commissioner of the INS Office of Management to the Department of Justice ("DOJ"), INS's parent agency. Pl. Ex. 18.

36. DOJ reviewed INS's request for an exemption and decided not to seek an exemption from OPM. It communicated this decision to INS in an April 24, 2002 memorandum. Pl. Ex. 19.

## VII. OPM Revisits The Question Of Overtime Wages For Entry-Level Training

37. In the fall of 2002, Donald Bryce Baker, then Senior Advisor to the Assistant Director for Compensation Administration, conducted a review of OPM's FLSA overtime pay regulations as a part of an agency-wide project to review OPM regulations for possible plain language improvements. Ex. 4 (Baker Decl.), ¶ 3.

38. In the course of Mr. Baker's review of the regulations, he came across 5 C.F.R. § 551.421. Ex. 4 (Baker Decl.), ¶ 4. This regulation states:

> For purposes of this part, "regular working hours" means the days and hours of an employee's regularly scheduled administrative workweek established under part 610 of this chapter.

39. At this time, Mr. Baker recognized the connection between the definition of "regular working hours" in 5 C.F.R. § 551.421 and the provision in 5 C.F.R. § 551.423(a)(3) dealing with entry-level training. Ex. 4 (Baker Decl.), ¶ 6. He advised Ms. Draper of this and stated that OPM's prior determination that overtime wages were not authorized for FLETC trainees may have been incorrect. Id.

## VIII. OPM Advises The Forest Service Of Its Change In Interpretation

40. On December 17, 2002, Ms. Draper sent an email to Claude Stribling (of the U.S. Forest Service) as well as Gary Wilson of the USFS, informing them that FLSA did require payment of overtime wages to entry-level trainees. Pl. Ex. 9, MOR-136.

41. The following day, December 18, 2002, Mr. Wilson replied to Ms. Draper via email and asked her whether the original determination (that overtime wages were not authorized) was wrong. He also asked her whether the payment of overtime wages to FLETC trainees was required. Pl. Ex. 9, MOR-135.

42. On December 18, 2002, Ms. Draper responded to Mr. Wilson via email, stating: "Regrettably, our original determination was incorrect." She explained that the Forest Service was required by FLSA to pay these overtime wages to current and past FLETC trainees. Pl. Ex. 9, MOR-135.

## IX. INS Learns Informally Of The Change In OPM Guidance And Seeks Official Guidance

43. On February 13, 2003, Mr. Wilson sent Mr. Coleman a copy of the December 18, 2002 email in which Mr. Draper explained that OPM's prior determination had been incorrect. Ex. 12 (Coleman email correspondence), A213.

44. Upon receipt of the email from Mr. Wilson, Mr. Coleman contacted Mr. John Cahill, Director of Human Resources for INS's parent agency, DOJ. Mr. Coleman forwarded the Draper-Wilson email correspondence to Mr. Cahill. Ex. 12 (Coleman email correspondence), A213.

45. On February 19, 2003, Mr. Cahill contacted OPM regarding the issue via an email to Ms. Perrini. Ex. 13 (Cahill-Perrini email correspondence), A219. Mr. Cahill's email stated:

> It is apparent that OPM has, in the past, given verbal advice to several agencies on this topic, and that agencies have relied on that advice for several months. Should OPM decide to change that advice, it must be in a way that speaks for OPM officially.

## IX. The Department of Homeland Security Is Formed, Absorbs The Former INS, And Is Informed Of The Overtime Issue

46. The Department of Homeland Security ("DHS") was created by Public Law 107-296 (November 25, 2002), and officially began operations on January 24, 2003.

47. Several new agencies were created out of former agencies to constitute DHS. This process was not complete for most of the component agencies until March 1, 2003. Ex 35 (Reorganization Plan Modification for the Department of Homeland Security), A386; Ex. 1 (2007 Coleman Decl.), ¶ 22.

48. When DHS was created, the former INS became part of the new Bureau of Immigration and Customs Enforcement ("ICE"), the new Bureau of Customs and Border Protection ("CBP"),

and the new United States Citizenship and Immigration Services ("CIS"). Ex. 21 (ICE, "About Us"), A271; Ex. 22 (CBP, Customs and Border Protection Today, "One Team, One Fight"), A273-74; Ex. 23 (CIS, "About Us"). The former U.S. Customs Service also became part of ICE and CBP. ICE, CBP, and CIS were new agencies within DHS. Public Law 107-296.

49. During the transition period, INS pay personnel, as well as pay personnel from other agencies were responsible for handling pay matters for all of ICE, CIS and CBP. Ex. 1 (2007 Coleman Decl.), ¶ 22; Ex. 2 (Declaration of Alethea Smalls, Dec. 18, 2007), ¶¶ 16-17.

50. During the transition period, DHS pay personnel were also engaged with developing a new pay system for DHS, unique in the federal system. Ex. 1 (2007 Coleman Decl.), ¶ 23; Ex. 32 (Coleman Depo.), 16:13-23, 232:11-7. The new DHS pay system was to be a pay-for-performance system. Ex. 19 (Fact Sheet: DHS and OPM Final Human Resource Regulations), A24.

51. On March 19, 2003, Steve Cohen of OPM contacted DHS regarding the overtime pay issue. Ex. 14 (Cohen-Allen email correspondence), A220. Mr. Cohen sent an email to Melissa Allen, Acting Chief Human Capital Officer, stating:

> Our staff made a mistake in the original guidance we provided agencies in response to specific questions we received in the fall of 2001 about 6-day training courses at the Federal Law Enforcement Training Center (FLETC). We are now attempting to correct that mistake. In fact, we are planning to post a Q & A on our Web site today to address this issue (copy attached). The draft Q & A has been reviewed and approved by OGC staff (Jim Green). We apologize for any inconvenience the new guidance may pose for all involved.

52. On that same date, March 19, 2003, the email from Steve Cohen to Melissa Allen was forwarded by Melissa Allen to the various heads of the newly formed DHS components and the heads of the various departments of human resources, including to Rick Hastings, Director of

Human Resources for ICE. Ex. 14 (Cohen-Allen email correspondence), A220. See Ex. 32 (Coleman Depo.), 20:15-19 (discussing position of Rick Hastings).

53. OPM did not post the Q&A on its website on March 19, 2003. Pl. Ex. 10.

54. Over the next few months, OPM personnel consulted with DHS pay personnel and others, regarding the overtime pay issue. Ex. 34 (Mikowicz Depo.), 193:11-198:19; Ex. 4 (Baker Decl.), ¶¶ 7-8; Pl. Exs. 9, 10.

55. During the course of these consultations, DHS received several inquiries from its employees regarding the overtime pay issue. Ex. 1 (2007 Coleman Decl.), ¶ 20; Pl. Ex. 6.

56. On May 6, 2003, DHS sent a broadcast email to its employees in response to these inquiries. Pl. Ex. 6. The email stated:

> Recently, we have had many inquiries from employees regarding the payment of premium pay for a 6th day of training while at FLETC. These inquiries have been prompted by a memorandum from the Forest Service, a bureau of the Department of Agriculture.
> . . .
> To date, however, we have had no official guidance from the OPM or the Department of Homeland Security (DHS) about this issue. Until such guidance is received, we have no legal authority to pay any additional premium pay for those who attended a 6th day of training in 6-day training week. We have a complete listing of all employees who attended basic training since FLETC went to a 6-day training week. If guidance is received from OPM directing payment, we will work to identify funds, and undertake prompt and complete payment as required.

57. After completing its consultations, OPM posted on its website in July 2003, a Q&A explaining that FLSA authorized overtime wages to entry-level trainees. Pl. Ex. 10.

## X. Upon Receipt of Official Guidance, Immigration and Customs Enforcement (ICE) Begins Payment Process

58. On August 6, 2003, ICE received authority from DHS to pay FLSA overtime to legacy INS employees who had attended the six-day training schedule at FLETC. Ex. 1 (2007 Coleman

Decl.), ¶¶ 20-21; Ex. 28 (2004 Coleman Decl.), ¶ 7; Ex. 29 (2006 Smalls Decl.), ¶ 7.

59. The following pay period (Pay Period No. 17-03: August 24, 2003 - September 6, 2003), INS began paying overtime wages to all nonexempt ICE employees attending training at FLETC. Ex. 29 (2004 Coleman Decl.), ¶ 7; Ex. 16 (Ehrbar-Arndt email correspondence), A227-28.

60. ICE determined that legacy INS employees who had attended the six-day training schedule at FLETC would receive back overtime wages as well as an interest payment calculated under the Back Pay Act, 5 U.S.C. § 5596. Ex. 1 (2007 Coleman Decl.), ¶¶ 20-21; Ex. 29 (2006 Smalls Decl.), ¶ 14; Ex. 2 (2007 Smalls Decl.), ¶ 4; Ex. 32 (Coleman Depo.), 25:3-10.

61. The process of making retroactive payments involved the following steps: collecting data on trainees, compiling payment lists of trainees, calculating the amount of the payments, and making arrangements for payment through the National Finance Center. Ex. 1 (2007 Coleman Decl.), ¶¶ 24-31; Ex. 29 (2006 Smalls Decl.), ¶ 8; Ex. 2 (2007 Smalls Decl.), ¶ 7. See Def. F. ¶¶62-74, infra.

62. Beginning in August 2003, ICE compensation policy staff (including Alethea Smalls) began the process of retroactive payments to legacy INS employees who had attended the six-day training schedule at FLETC. Ex. 2 (2007 Smalls Decl.), ¶ 6; Ex. 16 (Ehrbar-Arndt email correspondence).

63. The first step in this process was for ICE to collect, from FLETC, the names of those employees and former employees who attended training between January 1, 2002 and August 24, 2003 and identify the number of days that the employees attended sessions on a regularly scheduled 6th day of training. Ex. 28 (2004 Coleman Decl.), ¶ 8; Ex. 29 (2006 Smalls Decl.),

¶ 8; Ex. 16 (Ehrbar-Arndt email correspondence).

64. Over 4,000 legacy INS employees had attended FLETC during the time period in question. Ex. 17 (Memorandum from ICE to DOJ, Feb. 3, 2004); Ex. 2 (2007 Smalls Decl.), ¶ 9.

65. At the time the decision was made to made the retroactive payments, there was no central training system that tracked INS or ICE employees as they went through training. Accordingly, to collect the required trainee data, ICE compensation staff were required to find class rosters for each FLETC class. These rosters were not maintained in a central location, and not all were computerized. Rather, some were maintained in the files of individual instructors, some were stored on individual supervisory instructors' computer systems, and some were located in the FLETC training staff central office. This required an extensive search of electronic files and hard copy files. Ex. 1 (2007 Coleman Decl.), ¶ 24; Ex. 11 (GAO Report), A164-66; Ex. 2 (2007 Smalls Decl.), ¶ 10; Ex. 32 (Coleman Depo.), 238:2-16.

66. In addition, FLETC training staff were already fully engaged with the process of trying to train more federal law enforcement officers in a shorter period of time. Ex. 11 (GAO Report), A138, A147, A152, A164-66 (discussing surge in law enforcement personnel attending training and strain on FLETC resources); Ex. 1 (2007 Coleman Decl.) ¶ 25. As a result, it was difficult for FLETC to dedicate resources to the task of collecting trainee data. Ex. 1 (2007 Coleman Decl.) ¶ 25; Ex. 32 (Coleman Depo.), 238:17-25. This meant that over a period of months, on several occasions, ICE staff were told that the trainee data was complete, only to later find that FLETC was still locating additional class roster lists. Ex. 1 (2007 Coleman Decl.), ¶ 25.

67. Further, due to the creation of DHS, former INS employees had been transferred to three different agencies, namely ICE, CBP, and CIS. Ex. 21 (ICE, "About Us"), A271; Ex. 22 (CBP,

Customs and Border Protection Today, "One Team, One Fight"), A273-74; Ex. 23 (CIS, "About Us"); Ex. 1 (2007 Coleman Decl.), ¶ 26; Ex. 2 (2007 Smalls Decl.), ¶ 11. Some had also retired or left Federal service. Ex. 1 (2007 Coleman Decl.), ¶ 26. For these employees, ICE had to find current mailing addresses. Id. This made the process of collecting trainee data and compiling payment lists particularly demanding. Id., Ex. 32 (Coleman Depo.), 239:2-14.

68. Like several other federal agencies, the former INS contracted with the National Finance Center to process payments to its employees. Ex. 24 ("National Finance Center (NFC) History"), A280; Ex. 1 (2007 Coleman Decl.), ¶ 29; Ex. 2 (2007 Smalls Decl.), ¶ 12.

69. In addition to collecting trainee data and compiling payment lists, ICE was required to seek assistance from DOJ (as the former parent of the former INS). On February 3, 2004, ICE made this request through a memorandum from C. Rick Hastings, Director of Workforce Management for ICE to Terance L. Cook, Assistant Director, Justice Management Division, Department of Justice. Ex. 17, A229.

70. ICE was also required to establish an agreement for services with the National Finance Center. Ex. 1 (2007 Coleman Decl.), ¶ 30; Ex. 2 (2007 Smalls Decl.), ¶ 13; Ex. 29 (2006 Smalls Decl.), ¶ 8; Ex. 15 (Memorandum from ICE to NFC, Sep. 10, 2004); Ex. 18 (Reimbursable Agreement Between ICE and NFC, Sep. 10, 2004).

71. Negotiations with the NFC involved multiple issues (cost of the service, which party would be responsible for the calculations, issues involving the reorganizations, communications) which was further complicated by the fact that due to the reorganizations, the ICE/NFC Liaison was not available to assist. Ex. 1 (2007 Coleman Decl.), ¶ 31; Ex. 2 (2007 Smalls Decl.), ¶ 14.

72. The process of negotiating with NFC slowed the process of making the back overtime wage payments. Ex. 1 (2007 Coleman Depo.), ¶ 31; Ex. 32 (Coleman Depo.), 242:4-19, 252:7-253:3.

73. The ICE-NFC Agreement was executed in September 2004. Ex. 18 (Reimbursable Agreement Between ICE and NFC, Sep. 10, 2004).

74. The reimbursable agreement with NFC stated that NFC was to pay back overtime wages plus Back Pay Act interest. The reimbursable agreement did not state that NFC was to pay liquidated damages, nor did it even discuss liquidated damages. Ex. 18 (Reimbursable Agreement Between ICE and NFC, Sep. 10, 2004).

75. Coordination of costs also had to be made between the three organizations that were formed from the former INS: CBP, ICE, and CIS. Ex. 1 (2007 Coleman Decl.), ¶ 28; Ex. 2 (2007 Smalls Decl.), ¶ 18.

76. Moreover, on or about August 22, 2004, ICE Human Resources employees including the Compensation Policy Branch, were transferred to U.S. Customs and Border Protection. Ex. 1 (2007 Coleman Decl.), ¶ 27; Ex. 2 (2007 Smalls Decl.), ¶ 15.

77. The subsequent reorganization of INS and the resulting creation of ICE, CIS, and CBP changed the responsibility for pay policy. Ex. 1 (2007 Coleman Decl.), ¶¶ 22, 27; Ex. 2 (2007 Smalls Decl.), ¶ 16. After the move of ICE Human Resources to CBP, ICE pay personnel were initially required to provide service to CIS and ICE in addition to being responsible for CBP pay issues. Id. Ultimately, one member of ICE pay personnel, Alethea Smalls, inherited full responsibility to complete the overtime payment calculations. Ex. 2 (2007 Smalls Decl.), ¶ 17.

78. Finally, during this period, DHS pay personnel were engaged with developing the new DHS pay-for-performance pay system. Ex. 1 (2007 Coleman Decl.), ¶ 23; Ex. 19 (DHS Fact Sheet), A241; Ex. 32 (Coleman Depo.), 16:13-23, 232:11-17.

## XI. Payments to Plaintiffs Begin

79. Payments to the plaintiffs began December 2004. Ex. 2 (2007 Smalls Decl.), ¶ 19; Ex. 29 (2006 Smalls Decl.), ¶ 17. 3,900 of the employees owed back overtime were paid by ICE in December 2004. Id. The remaining 300 were paid by June 2005. Ex. 2 (2007 Smalls Decl.), ¶¶ 19, 22; Ex. 29 (2006 Smalls Decl.), ¶ 19.

80. Retroactive payments to legacy INS employees still employed by the DHS were made via direct deposit. Retroactive payments to legacy INS employees no longer employed by DHS were made via check sent by mail. Ex. 2 (2007 Smalls Decl.), ¶ 20.

81. Legacy INS employees receiving payments also received a Statement of Earnings and Leave. Ex. 2 (2007 Smalls Decl.), ¶ 21. This Statement was generated by NFC. Ex. 2 (2007 Smalls Decl.), ¶ 21; Ex. 3 (Benit Decl.), ¶ 5. For some, the interest portion of the payment appeared on the Statement under the line item "LIQ.DAMAGES/INT.BACKPAY." Ex. 3 (Benit Decl.), ¶ 12.

82. This line item is used to differentiate earned income which appears on the employee's Form W-2 and unearned income which will be reported on a Form 1099. Ex. 3 (Benit Decl.), ¶¶ 10-11.

83. All known employees have been paid back overtime wages for the sixth-day training sessions, along with Back Pay Act interest from the date when they attended the sixth-day training sessions until they received payment. Ex. 2 (2007 Smalls Decl.), ¶ 22.

84. The plaintiffs were not told that they had received, or would be receiving, liquidated damages. Pl. Ex. 26; Pl. Ex. 28; Ex. 1 (2007 Coleman Decl.), ¶ 32.

## XII. Plaintiffs File Suit

85. On June 1, 2004, the case of Moreno v. United States, was filed in the United States District Court of the District of Columbia as case No. 1:04CV00899. Ex. 25 (Docket of Moreno v. United States, D.D.C. No. 1:04CV00899). The case was dismissed November 8, 2004.

86. On January 21, 2005, the case of Moreno v. United States was filed in the United States Court of Federal Claims as case No. 05-142C. Ex. 26 (Docket of Moreno v. United States, Fed. Cl. No. 05-142). The first consent to sue by any plaintiff other than Moreno was filed May 23, 2006. Id.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Assistant Director

Of Counsel:
ARTHUR RETTINGER
Senior Counsel
Office of Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229
Tel: (202) 344-2978
FAX: (202) 344-2950

MELANIE WATSON
Attorney-Advisor
Office of Personnel Management
1900 E Street, NW
Washington, DC 20415
Tel: (202) 606-1700
Fax: (202) 606-0082

s/ Maame A.F. Ewusi-Mensah
MAAME A.F. EWUSI-MENSAH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0503
Fax: (202) 514-8624

December 21, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 21st day of December 2007, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Maame A.F. Ewusi-Mensah