# EXHIBIT 5

WAYNE A. COLEMAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| THOMAS C. PORTA, et al., | : | No. 05-14210C and |
| and | : | No. 05-759C |
| ANDREW D. BARTH, et al., | : | Consolidated |
| Plaintiffs, | : | |
| v. | : | (Judge Firestone) |
| THE UNITED STATES, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - -x

DEPOSITION OF WAYNE A. COLEMAN

Washington, DC

Wednesday, November 29, 2006

REPORTED BY:

VICTORIA L. WILSON

WAYNE A. COLEMAN

**Q It is in the interest of everyone to get complete answers. If you don't understand one of the questions that I ask today, please let me know. I'm happy to try to clarify it or ask it in another way that may be more clear. And, indeed, if there are documents that may help you understand the question, I may have them here so I can take a look for them and see if I can get those to you. Also, during the course of the deposition, if there are any documents that you think would refresh your recollection, please let me know. We may have them here or there may be documents that we can get in the interest of getting the fullest testimony. If you do answer a question, the assumption will be that you understood the question. Is that okay?**

A Okay.

**Q As with last time, we can take a break any time you need one, whether to stretch your legs, clear your head, you are feeling tired, visit the men's room, whatever you want. Indeed, if you feel like you need a break, there is probably more than one of us do. The only thing I would ask is if there is a question pending, that you answer the question before we take the break.**





WAYNE A. COLEMAN

A Okay.

**Q Do you understand that you are testifying at this deposition as the Government's representative?**

A Yes, I do.

**Q Do you know why you were chosen to testify as the Government's representative?**

A I think because I understand the case and the situation that's involved.

**Q Have you been involved with this case in the past?**

A Yes. When it first started, we started by fielding questions from employees regarding the fact that they had attended a sixth day of training and, therefore, were wondering whether or not there was compensation for that, so we kind of started right at the ground level, I guess you could say, by getting those kinds of questions and then beginning the process of trying to make sure employees were properly paid for that time.

**Q And who chose you to represent the Government in this action?**

A Well, that I'm not exactly sure. I'm assuming it is the chief of compensation and





WAYNE A. COLEMAN

classification for the U.S. Customs and Border Protection.

**Q And who is that?**

A That's Ronelle Rotterman.

**Q In your last deposition, you gave me a -- I think a full description of your work history and your job duties. Has anything changed since that deposition?**

A No.

**Q Your title remains the same?**

A Yes, it does.

**Q Job duties remain the same?**

A Yes.

**Q And have you taken on any additional job duties?**

A No.

**Q Have any of the people that you report to changed?**

A No.

**Q And have any of the people that report to you changed?**

A No.

**Q Do you understand the gravamen of the claims in this case?**





WAYNE A. COLEMAN

A I believe so.

**Q And what do you understand them to be?**

A That the employees initially were not paid for the time that they spent in the sixth day of training and that they are, at least I'm assuming, are asking for some kind of compensation for that.

**Q And when you say, "the employees," are there specific employees that you are referring to?**

A In this particular case, they are Border Patrol agents, yes, who attended a series of classes that were held at the Federal Law Enforcement Training Center in Georgia and attended those classes on six regularly scheduled days.

**Q And is it your understanding that those plaintiffs were assigned to attend that training for six days a week?**

A Yes.

**Q And is it your understanding that the plaintiffs did attend that training for six days a week?**

A As far as I know, yes.

**Q Is it your understanding that the plaintiffs in this case were not exempt from the FLSA --**

A Yes.
Q I'm sorry.
-- from the Fair Labor Standards Act? I often use the abbreviation FLSA, F-L-S-A.
So is it your understanding that they would be entitled to overtime pay under the FLSA, as a general proposition?
A Yes.
Q Is it your understanding that the plaintiffs in this case were plaintiffs that were in one of four classes that trained at the FLETC?
A Yes, that's correct.
Q And is it your understanding that FLETC stands for Federal Law Enforcement Training Center?
A Yes.
Q And is that the training center in Glencoe, Georgia?
A Yes, it is.
Q And if I use F-L-E-T-C or FLETC, will you understand that to be the Federal Law Enforcement Training Center?
A Oh, yes.
Q Thank you.
Do you know when those four training





classes took place?
A The first one began in October of 2003 and I believe the last one ended in May of 2004.
Q Let me show you a document --
MR. SWEENEY: Mr. Rayel, is there a stapler?
MR. RAYEL: Yes.
MR. SWEENEY: Thank you very much. I apologize.
BY MR. SWEENEY:
Q If I may show you a document, Mr. Coleman, this document is Bates stamped 1057 through 1065, although not in that order. I'll ask you to take a look at that and let me know if you recognize the document.
A It appears to be a class roster for -- it looks like two different sessions, at least two different sessions. That looks like four different sessions.
Q And are they the four sessions that we are referring to today?
A I believe so. The dates on them are correct.
Q Okay. And I just would like to take you





back to the page that's Bates stamped 1061, although, again, it is out of order. It is the fourth from the last. If you would look up in the top line there, does that refresh your recollection as to when these classes began?
A Well, no, that's not the information I had but it would be in the right time frame for this, yes.
Q And is your understanding that class number 557 is one of the classes at issue here?
MR. RAYEL: Mr. Sweeney, I'm not sure these are Bates stamped. There could be some confusion.
MR. SWEENEY: Whether they are Bates stamped?
MR. RAYEL: Oh, here they are.
MR. SWEENEY: They are Bates stamped. I apologize they are out of order. They were produced out of order so I tried to put them in some --
MR. RAYEL: Got caught in the middle there, that's why --
THE WITNESS: The dates I was given for the classes is more like the one that begins with the class 410, 10/09/2003 to 2/04/2004. And that





sounded more like -- I was not aware that there was one that had started before that time.
MR. SWEENEY: Can we mark that document as Porta Plaintiffs' Exhibit 1?
(Porta Plaintiffs' Deposition Exhibit 1 identified.)
BY MR. SWEENEY:
Q Mr. Coleman, when the plaintiffs in this case trained at the FLETC, were they required to fill out time sheets?
A They probably would have been, yes.
Q And in those time sheets, would they have been instructed to fill out the time that they spent training on the sixth day for a week?
A That I can't tell you from my own knowledge. I don't know what instructions they received.
Q Okay. And do you know if, in fact, the plaintiffs did fill out the sixth day of training on the time sheets?
A No, I don't.
Q Okay. And if they didn't fill out the sixth day of training on the time sheets, do you know why they did not?

WAYNE A. COLEMAN

MR. RAYEL: Objection; speculation.

BY MR. SWEENEY:

**Q You can speculate.**

A No, I really don't. I know that when you had -- in the Moreno case, we had earlier given directions to the folks at the training academy to have people record the time that they actually spent in class and there -- and if, then, that time later became compensable, we would then have a record of that time and it would make it easier to make sure they were paid properly. I would assume if they were at Glencoe taking this training, that they would have received that same kind of instruction, so it would seem reasonable that they would have filled out the information on the time card.

**Q Okay. And you are making that assumption. Were you working with CBP at the time -- with Customs and Border Protection at the time that these training classes took place?**

A Let me stop and think about that a moment.

Yes, I believe we were.

**Q And when you say, "we," who were you referring to?**

A No, I take that back. We were not. We





WAYNE A. COLEMAN

were still at that point -- because of the time frames -- actually, I guess we would have been by that time, by, say, fall of 2003. I believe that's when we made the transition to Customs.

**Q And when you say, "we," who are you referring to?**

A The entire compensation staff that had been with INS previously and then transferred to ICE and then eventually were merged in with Customs and Border Protection Human Resources office. I think we talked about that in the last deposition, that I had been working for the Immigration and Naturalization Service and when the Department of Homeland Security was stood up in March of 2003, that organization was merged into the Department and we actually became part of a bureau that was called the Immigration and Customs Enforcement. That bureau eventually lost most of its personnel office and that office was merged into the Customs and Border Protection Human Resources office and that's where we eventually ended up.

**Q And it is your understanding that that merger into the Customs and Border Protection Services happened in the fall of 2003; is that**





WAYNE A. COLEMAN

**right?**

A I think it was in the fall of 2003, yes.

**Q So you were working at the CBP -- well, I'll use the acronym "CBP." Will you understand that to mean Customs and Border Protection Services?**

A Yes, I will.

**Q Okay. So you were working at the CBP when these training classes were going on; is that correct?**

A I'm thinking. That's why I am hesitating here.

No, I'm sorry, we would not. It was the 2000 -- well, yes, that's true. It was 2004. It was the fall of 2004 when we merged with the Customs and Border Protection. In 2003, we were still part of ICE. And these classes were then held in 2004, so, yes, that would be 2003, 2004.

**Q Okay. So I just want to be straight. I think you testified before that you moved over to Customs and Border Protection, CBP, in about August of 2004.**

A And that's right.

**Q That's right?**

A Yes.





WAYNE A. COLEMAN

**Q Okay.**

A That's why I hesitated, because August of 2003 was when we first started getting information from the Department that we should go ahead and pay and we were still part of ICE at that point, so it wasn't until about a year later that we made the transition, so it was -- it was August.

**Q And when you say, "ICE," you mean the Immigration and Customs Enforcement --**

A Enforcement.

**Q -- Service?**

A There is no "Service" on it; it was just Immigration and Customs Enforcement.

**Q So we will use that acronym, as well; is that fair?**

A Yes, ICE.

**Q When you were working at ICE, did you have any responsibilities for CBP?**

A No. No.

**Q Did CBP have its own compensation staff?**

A Yes.

**Q And do you know who that compensation staff was?**

A Primarily, it would be Ronelle Rotterman.

WAYNE A. COLEMAN

She was the chief of compensation in classification.

**Q And do you know what her title is currently?**

A Probably the same, chief of classification in compensation.

**Q And was she the only -- well, let's go back. I think at your last deposition, you testified that there was a group of people at ICE that worked on compensation issues; is that right?**

A That's correct.

**Q And what did you call that group?**

A We would -- compensation policy staff.

**Q Did CBP have a compensation policy staff?**

A Ronelle was primarily the person that was contacted if there were questions, as far as I know, anyway, if there were questions about compensation.

**Q And does CBP now have a compensation policy staff in addition to Ronelle Rotterman?**

A Yes, what's left of the ICE compensation policy staff moved over to CBP and actually physically moved there in October of 2004 and so the folks who were left there, and in this case it's Alethea Smalls, it is her staff at this point for compensation, she also has one or two other people





WAYNE A. COLEMAN

who have been helping but I don't think that they are full-time in the compensation policy area.

**Q Okay. So at the time these classes were going on, the only one dealing with compensation issues within the Customs and Border Protection Service was Ronelle Rotterman; is that correct?**

A As far as I know, yes, that's correct.

**Q Okay. What was the structure of CBP? Strike that.**

**In your last deposition, we talked about kind of various structures that the INS had, where it reported, where it went for compensation, advice, and guidance, and then when it moved into the ICE that same structure, what was CBP's history, structural history, beginning in January of 2002, if you can?**

A Okay. Beginning in January 2002, it was the U.S. Customs Service and the U.S. Customs Service was a bureau in the Department of Treasury and, as such, if there were compensation policy questions that they felt either had border implications or they needed some more authoritative response to, they would go to the Department of Treasury Human Resources staff and they had a small





WAYNE A. COLEMAN

group of people there who dealt with compensation and pay.

**Q And do you know who those people were?**

A No, I don't anymore. By that time, I was with INS and the Department of Justice so I lost track and I know that there was some turnover in about that same time.

**Q Okay.**

A Then in March of 2003, like the rest of us that became part of the Department of Homeland Security, the Customs and Border Protection became -- was made up of the Customs Service but with the addition of the Border Patrol and those -- that organization, then, would, if they had compensation policy questions, go to the staff at the Department of Homeland Security for guidance, discussion, advice, that sort of thing.

**Q And do you know who at that point in March of 2003 was at the DHS handling compensation issues?**

A Probably if there was anybody dealing with them, it would have been Melissa Allen and only because there had been no other staff hired, as I understood it, at that time.

**Q And what was Melissa Allen's title?**





**WAYNE A. COLEMAN**

A I think she was the acting chief, human capital officer, and I think we talked a little bit about her in the last deposition, as well.

**Q So in March of 2003, Ronelle Rotterman was the only one at CBP handling compensation issues; is that right?**

A As far as I know, that's correct.

**Q And she could look to DHS for guidance but Melissa Allen was the only one at DHS to give her guidance; is that right?**

A To the best of my knowledge, yes.

**Q Could CBP go anywhere else for guidance?**

A She might have contacted, again, informally, the folks at the Office of Personnel Management. I don't know, you know, whether she has people that she knows over there regularly and has informal discussions with or not. I would assume she does. She has been in the business for quite a long time so I would assume that she knows people there and would have recourse to them if she needed to.

**Q And you say she could have gone there informally. Could she have gone to OPM for formal advice?**

WAYNE A. COLEMAN

A No.

**Q And why not?**

A The organization structure within the Government is hierarchical and Customs and Border Protection is a subset or subdivision of the U.S. Department of Homeland Security; therefore, any official guidance that they needed would -- they would contact the Department and if the Department then believed that further contact was necessary, they would, in turn, officially contact the U.S. Office of Personnel Management for an official guidance of some sort.

**Q Okay. So if Ronelle Rotterman wanted official guidance from OPM, she would have had to have gone to Melissa Allen and then Melissa Allen could have gone to OPM; is that correct?**

A That's correct.

**Q Was the Department of Justice involved at all as of March 2003 in any of these issues?**

A No. The reason being, as the Department of Homeland Security was stood up, Customs -- U.S. Customs Service was taken out of the Department of Treasury where it was a bureau and put into the Department of Homeland Security.





WAYNE A. COLEMAN

**Q Now, when we talked about the INS and ICE, I believe, in the last deposition, you indicated that the ICE, I believe, would go to the Department of Justice for advice or compensation issues and the Department of Justice -- strike that.**

**I believe you indicated that when you were working with INS and then with ICE, that if you wanted to go to OPM for formal guidance, that you had to go through the Department of Justice; is that correct?**

A While INS was part of the Department of Justice, we would have gone through the Department of Justice. Once ICE moved over to -- actually, once INS was restructured and became, among other things, ICE and, therefore, moved into the Department of Homeland Security, then we would have had to go officially to the Department of Homeland Security.

**Q And that began in March of 2003?**

A 2003.

**Q And do you remember what day?**

A The beginning of the first pay period, which probably was, like, March 3rd, 2003. Now, the confusing issue there is that when we then needed





WAYNE A. COLEMAN

assistance with setting up the reimbursable agreement with the national finance entity to do some of the computation work for ICE, we went through the Department of Justice because at that point we were still relying on them for assistance in getting our payroll provider to do things for us. It doesn't make a lot of sense but the Department of Homeland Security, being totally brand-new, did not have all of the resources and all of the connections in place in March of 2003 when the official stand-up was made, so there was a period of time afterwards where, as a practical matter, the components of the Department relied on their previous homes in order to provide them assistance in things like working with the payroll provider, for example, to get extra services from them.

**Q Okay. And do you know if Customs and Border Patrol continued that relationship with Treasury after they went to DHS?**

A I don't know that for a fact but I would not be surprised.

**Q Okay. Back when the U.S. Customs Service was part of the Department of Treasury, did the Department -- do you know if the Department of**





WAYNE A. COLEMAN

**Treasury was able to reach out to the Department of Justice with regard to compensation issues?**

A That would not be a normal thing to do --

**Q Okay.**

A -- unless staff at the Department of Treasury knew some of the staff at the Department of Justice. There might be informal relationships but there would be no formal or official guidance that would go that way.

**Q So on compensation issues with the U.S. Customs Service, U.S. Customs Service would make the decisions. If they needed guidance, they would go to the Department of Treasury. If the Department of Treasury needed guidance, the proper place for it to go would be to OPM; is that correct?**

A That's correct.

**Q Okay. And then once CBP became part of DHS, they looked to DHS for compensation policy. And if DHS had issues, DHS could go to OPM; is that correct?**

A That's correct.

**Q And once DHS was established, at least with respect to compensation policy, Department of Justice was out of the loop even for INS; is that**

WAYNE A. COLEMAN

keeper who then went into the system and actually input the hours.

**Q Okay. So at this time -- and this pay period is from January 25th of 2004 to February 7th of 2004; is that right?**

A That's correct.

**Q The employee would have been filling out the time sheet by hand and turning that in to someone; is that correct?**

A That's correct.

**Q And who would they have turned it into?**

A Normally, each one of the stations had a timekeeper, somebody whose job it was to keep track of the time, and they may have assisted with scheduling, as well. But they would have been the person responsible for signing into the on-line time and attendance system and filling that out for each one of the individuals.

**Q So if the person in this case, Mr. Ramirez, was at training at the FLETC, who would have -- would there have been a timekeeper at the FLETC that he would have turned his time into?**

A No. The time sheets would have been filled out by hand by Mr. Ramirez at FLETC. They





WAYNE A. COLEMAN

would have been faxed -- or that would have been the normal practice would be to fax them back to his station wherever he was permanently stationed and the timekeeper there would do the input for him.

**Q And who would do the actual faxing of the hours?**

A I understand that the instructors did that quite often. So there is -- for each class, there typically was an instructor assigned as kind of the mentor for the class, and among that person's responsibilities were things like this.

**Q And on the handwritten copy -- would the hours on this deviate in any way from the handwritten copy?**

A They should not, no.

**Q So if Mr. Ramirez had filled in that he worked eight hours on Saturday, should that have shown up on here?**

A It probably should have. The problem was, of course, if you put it into the system here, they would have had to try and find a code for it in order to either pay or not pay for those hours. And I'm assuming the reason it may not be here, if he was one of the attendees at a class in this period





WAYNE A. COLEMAN

of time, was that they did not -- there is no code in there which would say, "Time is spent in training, noncompensable." So it would probably have been more on the handwritten document that he completed initially and not put into the timekeeping system itself.

**Q Now, you had said before that at least when you were with ICE and with INS, I believe, that people that were training at the FLETC were instructed to keep track of the actual hours they kept; is that correct?**

A That's correct.

**Q So they would have filled in on their handwritten record the eight hours on Saturday; is that correct?**

A That's what I understand they were told to do, yes.

**Q And when they faxed that sheet back to their timekeeper, is it your understanding the timekeeper would not have included those eight hours in the computer program?**

A Yes.

**Q If you would look down on what's been marked page 24, the NFC time and attendance work**





**WAYNE A. COLEMAN**

**sheet, down about two-thirds of the way down that chart, they have four hours listed on Friday. Do you know what that four hours is for?**

A Well, based on the code and the explanation that's off in the left-hand side there, it would be for Title 5 overtime with night differential.

**Q And what would they have been paid for that overtime?**

A They would have been paid overtime. Since these are nonexempt employees, I'm assuming they would have been paid overtime under the Fair Labor Standards Act for four hours and have received four hours of night differential, as well.

**Q And what was the night differential pay?**

A For general scheduled employees, it is 10 percent of basic pay.

**Q Okay. And if you look back at the third page, the page marked 25, there is a handwritten note in there. Do you see that?**

A Yes.

**Q Says, "Ladies, I just received the hours. Please note there is no holiday for this pay period," "PP." "Also, the OT is TC 25 on 1/29/04."**

**Do you know what he is referring to when he says there is no holiday?**

A Well, during this time on the calendar, as far as I know, there is no calendar -- there is no official federal holiday, so there should be no credit given for holiday time.

**Q And do you know who wrote this note? Can you tell by the signature?**

A No, I'm sorry, I can't.

**Q And where it says, "Ladies," do you know who it would have been referring to?**

A Again, it would be an assumption on my part but probably the people who would be doing the timekeeping for this particular station.

**Q And if you would go back to page 24, in the second week of the pay period, there are no regular hours listed for the Friday. Do you see that?**

A Yes, that's correct.

**Q Based on the documents here, do you understand or can you surmise what happened on that Friday?**

A Well, based on the codes the hours are set next to, not quite halfway down the page for that







particular Friday, those eight hours on Friday were credited as annual leave, which means the employee was given leave not to be in class.

**Q And if we go back to the first page, you had said that this was an approval sheet; is that right?**

A That's what it looks like, yes.

**Q And do you know who is charged with doing the approval?**

A I can't tell you for certain but it looks like, if we look at the sheet marked 24, there is a supervisor's signature in the lower right-hand corner. I'm kind of taking this, you know, logically through what I think might have happened: The employee filled out a time sheet by hand, it was faxed to the station, the timekeepers input that time sheet, they printed this as a report for the supervisor to look at, the supervisor reviewed it, accepted it, and then that would have been the time that the timekeeper would have gone back in, unless the supervisor had access to it, too, which is a possibility. One of the them would have gone back in and then approved this is how I would see the normal flow of events.







**Q And once this approval had been executed, then the pay would be processed; is that correct?**

A It -- that -- yes. I mean it would have to flow down to the National Finance Center and go through the machinations of the computer down there but yes.

**Q I'll show you another document and ask you to take a look at that and see if you recognize it.**

A No, this is not really a document I'm familiar with, but what it appears to be, I mean just based on what the tilting of it is, is a scheduling system which would allow the supervisor or whoever is charged to do it to go in and set up a work schedule for the employee.

**Q And if this work schedule was --**

MR. SWEENEY: Well, actually, mark this as Porta Number 3.

(Porta Plaintiffs Deposition Exhibit 3 identified.)

BY MR. SWEENEY:

**Q If this work schedule was for a time during which the employee was at FLETC training and working on Saturday, should it include the Saturday, eight hours on Saturday?**







A I would have expected it to do so, yes.

**Q Can you think of any reason why it would not?**

A No, I can't. Clearly, the class roster would show the days that the employees were expected to be in class and the times they were expected to be there.

**Q And who keeps --**

A I shouldn't say the class roster. The class schedule would have that.

**Q And who would keep the class schedule?**

A It would be the training academy. They would have had to develop that beforehand to know how to utilize the space and who is going to be where at what time.

**Q When you say, "the training academy," you mean the FLETC?**

A Because -- because of the interconnection between the Border Patrol Academy and the FLETC and the fact that the Border Patrol agents were being trained at FLETC, I'm not sure who would have set the schedule up specifically, but, clearly, the two organizations working together would have done that.

**Q And is that done in a computerized**

WAYNE A. COLEMAN

**Q I just want to be clear that I get an authoritative answer on this. When you said that six-day-a-week training did not take place -- strike that.**

**You said six-day-a-week basic training did not take place at the Border Patrol Academy in South Carolina. Do you know that for a fact or is that to the best of your knowledge?**

A In preparing for this, I spoke with the assistant chief who is responsible for seeing that the employees who attended the sixth day of training at FLETC were paid and I asked him about that. He said to the best of his knowledge and as far as their records show, there have been no six-day classes either at Charleston or in Artesia.

**Q And was that person Mr. Thomas Walters?**

A No. It was Richard Hudson.

**Q And do you know how long Mr. Hudson has been in that position?**

A Since October of 2004.

**Q And do you know who preceded him in that position?**

A No, I don't.

**Q Mr. Coleman, at the time that the**





**WAYNE A. COLEMAN**

**plaintiffs did their basic training at the FLETC, were they paid for the sixth day of training each week?**

A Not as far as I know, no.

**Q Were they paid any overtime -- were they paid any overtime for that sixth day of training?**

A No.

**Q Were they paid any wages at all for the sixth day of training?**

A As I understand it, they were not, no. And I think as we had talked about when we did the Moreno deposition, we believed at that -- well, actually -- no, strike that. Strike that.

**Q We will get into that. We will get into that. It is probably a -- I appreciate your offering that now but we will take the order.**

**Did the Government eventually pay the plaintiffs in this case for the sixth day of training?**

A Yes, they did.

**Q And when did they do that?**

A I believe it was earlier this year. I didn't realize it was quite that late but apparently the payments weren't made until sometime in the





WAYNE A. COLEMAN

spring.

**Q I would like to show you a document that's Bates stamped 1184 through 1187 and ask you to take a look at that. When you get a chance to review it, I would like to ask you a few questions.**

**(Witness reviewed the document.)**

A Okay.

**Q Do you recognize this document?**

A No. This is not one I have seen before.

**Q Does this refresh your recollection as to when people were paid for the sixth day of training at the FLETC by the Border Patrol?**

A I didn't realize it was quite that late.

**Q Does this refresh your recollection?**

A Yes, it does.

MR. SWEENEY: Let's mark this as Porta Number 8.

(Porta Plaintiffs Deposition Exhibit 8 identified.)

BY MR. SWEENEY:

**Q And after reviewing this document, would you like to restate your answer of when the plaintiffs got paid for the sixth day of work?**

A According to this document, they were paid





WAYNE A. COLEMAN

on July the 3rd of 2006.

**Q And over in the right-hand side on the first page, 1184, agency adjustment list, they have a -- for type of adjustment, they say, "Settlement, back pay"; do you see that?**

A Yes.

**Q Was this pay the result of a settlement?**

A I don't believe so, no. Certainly, when we started working with the Office of Border Patrol, the intention was once we communicated OPM's change in policy to them, their intention was to pay them, so there was no grievance or anything else that was filed, to the best of my knowledge, anyway, so this would -- this probably is just a standard coding feature that's in the system and it is a way of keeping track of it but I would -- to me, I would focus on the second word, "backpay."

**Q Okay. And when you say that -- that the CBP had the intention of paying the plaintiffs, what do you mean?**

A Once we started receiving telephone calls or communications from the employees who had attended the sixth day of training, the Border Patrol agents who had attended the sixth day of

WAYNE A. COLEMAN

**rosters for four classes, right? And they had to get whatever the back payment was for 173 people; is that right?**

A That's correct.

**Q And, yet, it took from the fall of 2004 until July of 2006, actually, longer than it took to pay the 3,900 people that were the INS employees. Why would that be?**

A I can't tell you. I really don't know what the internal machinations for the Border Patrol were but -- so I really couldn't do anything but speculate and I really don't even know where to given for that.

**Q Did you ask anybody about it in preparation for today's deposition?**

A Not specifically, no.

**Q Did you ask anybody why it took so much -- why it took the length of time that it did take to pay people?**

A Frankly, I didn't realize that it had taken until July of this year to make the payments. I thought the payments had been made some time ago.

**Q Do you know if the Government has paid all the Border Patrol agents that were part of those**





WAYNE A. COLEMAN

**four classes, not just the plaintiffs?**

A To the best of my knowledge, yes.

MR. RAYEL: Do you think this would be a good time to break for lunch? I have got 12:15.

MR. SWEENEY: We are actually going to go into a new area. So 12:15 --

MR. RETTINGER: Do you have an idea of how long you are going to be going to?

MR. SWEENEY: I don't think we are going to be a whole heck of a lot longer, although I wouldn't guarantee it would be under an hour.

MR. RETTINGER: Well, do you want to see about trying to go through or --

MR. SWEENEY: Up to you. I'm happy to try.

MR. RAYEL: It is up to you.

MR. SWEENEY: You know, Mr. Coleman is forthright and answers the questions.

MR. RETTINGER: Yes, we warned him about that.

THE WITNESS: The training didn't help at all.

MR. SWEENEY: So, you know, I'm willing to try and go through but I think it is up to guys and





WAYNE A. COLEMAN

probably up to the witness the reporter to make a consensus.

MR. RETTINGER: Do you have to make a quick phone call?

MR. RAYEL: Me? No.

THE WITNESS: If you think it is going to be an hour or so, that's fine.

MR. RETTINGER: Yes, we might as well finish and --

MR. SWEENEY: Why don't we give it a shot. Why don't we give it a shot. Because I don't know that will it will be any longer than that, although we will figure it out pretty quickly.

BY MR. SWEENEY:

**Q Okay. Mr. Coleman, do you know when CBP became aware that there was an issue about whether FLSA overtime should be paid to people who trained for six days at the FLETC?**

A With regard to the Border Patrol agents?

**Q The issue in general.**

A They would have become -- based on my conversations with Ronelle Rotterman, they would have become aware of the issue about the same time that we did at INS, that is sometime after the first





WAYNE A. COLEMAN

of January of 2002. Let me just clarify that. At that time, they did not have the Border Patrol agents working for them. They were -- Border Patrol was still part of Immigration and Naturalization Service but they had their own employees, that is the U.S. Customs Service had its own employees who were attending basic training at FLETC during this period of time and, therefore, would have been attending on a sixth day of training, as well.

**Q And was Ronelle Rotterman working with the Customs Service at that point?**

A Yes, she was.

**Q So Ronelle Rotterman would have been aware of the issue with respect to whether or not people training for the sixth day at FLETC were due FLSA overtime; is that right?**

A That's correct.

**Q To take you through some of the chronology that we went through in the Moreno case, in Moreno, we discussed an e-mail from Vicki Draper to Gary Wilson that was forwarded by Gary Wilson to you sometime in February of 2003. Do you recall that?**

A Yes, I do.

**Q And you forwarded that on to John Cahill**

WAYNE A. COLEMAN

**at the Department of Justice. Do you remember that?**

A That's correct.

**Q Around February 13th of 2003; is that right?**

A That's correct.

**Q Is there any reason to expect at that time that Ronelle Rotterman would have been aware of Ms. Draper's e-mail to Mr. Wilson?**

A I -- I can't answer that of my own knowledge.

**Q Do you know if John Cahill would have forwarded that information onto Ms. Rotterman or anyone else at the Customs Service?**

A Because the Customs Service was part of the Department of Treasury at that point, I would say it would be very unlikely.

**Q We also discussed in the Moreno case an e-mail from Steve Cohen in March of 2003 to Melissa Allen. Do you remember that?**

A Yes.

**Q Just show you a copy of this that's been marked Plaintiff's Exhibit 10 in the Moreno case and, I guess, for consistency's sake, we should mark this as Porta Exhibit 10.**





WAYNE A. COLEMAN

**(Porta Plaintiffs Deposition Exhibit 10 identified.)**

MR. SWEENEY: I planned that.

BY MR. SWEENEY:

**Q This is a document that's been Bates stamped Moreno 19 through 22.**

**Mr. Coleman, do you know whether or not Ronelle Rotterman would have received this e-mail from Mr. Cohen?**

A Based on the addressees to the e-mail, I would have to say no.

**Q Well, Mr. Cohen's e-mail is addressed only to Melissa Allen; is that right?**

A Yes, that's correct.

**Q And in this period of March 19th of 2003, Melissa Allen was with the Department of Homeland Security; is that right?**

A That's correct.

**Q And CBP was under the Department of Homeland Security; is that right?**

A That's correct.

**Q And Melissa Allen was Ronelle Rotterman's direct report; is that right?**

A No, that's not correct. Ronelle would





WAYNE A. COLEMAN

have reported to Bob Smith, Robert M. Smith, who was the director of Human Resources for U.S. Customs Service and he would have, in turn, reported to the commissioner of Customs. I can't say that I remember off the top of my head who that would have been. Melissa Allen would have been a technical reference or a technical resource for Ronelle but she would not have reported to her.

**Q Okay. So if Ronelle had any issues with respect to compensation, she would have gone to Melissa Allen?**

A Yes, that's correct.

**Q And would Melissa Allen, if there were issues with respect to compensation, have informed Ronelle about them?**

A More likely, she would have -- and I think that's -- you can see that from the message just above the one directly from Steve Cohen, which is going out from Melissa Allen to a number of people, she would have been more likely to have contacted the heads of components and the directors of Human Resources.

**Q And when you say, "the heads of components and directors of Human Resources," who are you**





WAYNE A. COLEMAN

**referring to?**

A In that case it would be the -- well, specifically for Customs, it would be the commissioner of Customs.

**Q And who was that?**

A And that -- and that's the one I'm having trouble with. I'm -- I don't remember exactly who that was at that point.

**Q Is it your understanding that this e-mail from Melissa Allen dated March 19th, 2003, would have gone to that person?**

A Yes.

**Q And can you pick --**

A Well, or in this case, I see Deborah Spero's name here. Deborah Spero was the deputy commissioner for Customs at that point.

**Q And was Deborah Spero in Ronelle Rotterman's chain of command?**

A Yes.

**Q And where would she have fallen?**

A She would have been above Bob but below the commissioner.

**Q So Ronelle Rotterman would have reported to Bob Smith, was it?**

WAYNE A. COLEMAN

A Smith.

**Q And Bob Smith would have reported to Deborah Spero and Deborah Spero would have reported to the commissioner?**

A That's correct.

**Q Anyone else you can see in this list that's from the Customs Service?**

A Well, I believe -- is it the third line of the "To" from Melissa Allen, when -- the e-mail from Melissa Allen appears to be Bob Smith. I have to assume that that is the same Bob Smith who was the director of Human Resources for Customs.

**Q Anyone else that you see in here that would have been involved with the Customs Service?**

A Well, I know Doug Browning did work at the Customs Service at one time. Now, whether he was there at this time, I really don't know.

**Q And do you know what Doug Browning did when he was at the Customs Service?**

A Not anymore, no. I would have to think about that a bit. I just --

**Q And Melissa Allen seems here to be circulating Mr. Cohen's e-mail to make these people aware that this issue was raised at a Human**





WAYNE A. COLEMAN

**Resources directors meeting; is that right?**

A That's correct.

**Q Okay. So can we assume that her intention here was to make sure that everybody knew that the issue was in play?**

A Yes, it certainly would appear that way.

**Q And who is David Hyde?**

A Well, I can't say that off the top of my head I can tell you that.

**Q He is listed -- his name is -- well, do you have any reason -- strike that. That's fine.**

**Do you know who Patty Lemko is?**

A No, I can't say that I do.

**Q And in this e-mail from Mr. Cohen, he lists OPM's position with respect to whether or not FLSA overtime needs to be paid for a sixth day of training at the FLETC; is that right?**

A That's correct.

**Q So at this point in time, the Customs Service knew that this was an issue; is that right?**

A That's correct.

**Q And the Customs Service knew that OPM's position on it was that people had to get paid; is that right?**





WAYNE A. COLEMAN

A That's correct.

**Q And the Customs Service was responsible for at this time CBP; is that right?**

A The Customs Service had become Customs and Border Protection; that's correct.

**Q Okay.**

A And one of their subordinate offices was the Office of Border Patrol.

**Q And two of the people that are listed on here, Ms. Spero and Mr. Smith, are the direct supervisors of Ronelle Rotterman; is that right?**

A That's correct.

**Q And what was Ronelle Rotterman's title at this time?**

A She was chief of classification and compensation.

**Q For --**

A For Customs and Border Protection. I think the connection that's missing, however, is that nobody that had this information was aware that Border Patrol was running classes on the sixth day and that's where part of the -- the breakdown was in communication. Again, to the best of my knowledge, anyway, Border Patrol did not come to anybody in





WAYNE A. COLEMAN

Human Resources and say, "We are planning to change or we are planning to send our employees to FLETC for a sixth day of training. Does that have any impact on how we need to pay those people?" Since there was no communication about this change in the employees' scheduling, there was no way that Mr. Smith could advise -- or Ronelle Rotterman could advise Border Patrol that this has an impact on how are we are going to compensate your employees.

**Q Was Mr. Smith in Border Patrol?**

A No.

**Q He was in --**

A He is in Customs and Border Protection.

**Q I'm sorry. He was in the Customs and Border Protection; is that right?**

A That's correct.

**Q And Ronelle Rotterman was in the Customs and Border Protection; is that right?**

A That's correct.

**Q And as of March 2003, both -- well, certainly Mr. Smith and Ms. Spero knew that you had to pay people for a sixth day if you made them work the sixth day at FLETC; is that right?**

A They were becoming aware that OPM was

WAYNE A. COLEMAN

talking about changing its policy, that's correct.

**Q Okay. And OPM -- Mr. Cohen clearly sets out their position here; is that right?**

A Yes.

**Q Okay. And is it safe to assume that at this point, Ms. Rotterman would have found out about it, either at this point or shortly thereafter?**

MR. RAYEL: Objection; speculation.

BY MR. SWEENEY:

**Q You can speculate. You are here as a 30(b)(6) witness.**

A Speculating, in that case, yes, I would have to assume that she did. She certainly kept up with the issues.

**Q So CBP knew about the issue and they knew that OPM's position was you had to pay people if you made them work a sixth day down at FLETC; is that right?**

A That's correct.

**Q Okay. So when you say nobody told CBP, well, CBP -- I guess I don't understand. CBP knew you had to pay them. Well, who was it that --**

A I didn't say nobody told CBP. What I said was that Border Patrol did not come to the Human





WAYNE A. COLEMAN

Resources office and say, "We are planning to send our employees to FLETC. They will be participating in the sixth day of training. Does that have any impact on the way we are going to compensate our employees?" So there was no communication between Border Patrol and Human Resources, two parts of the same organization, Customs and Border Protection, about a change in the working conditions that were going to be ordered for these employees. Therefore, since nobody was aware that Border Patrol was planning to put their people on a sixth day of training, there was no communication about the fact that you would need to compensate your employees if you were doing that.

MR. RAYEL: Mr. Sweeney, would it be okay if we took a brief break?

MR. RETTINGER: Short break?

MR. SWEENEY: If we have to, although we are right in the middle of something I'm trying to figure out. If you need to take the break, we need to take the break. I don't have a question pending.

MR. RETTINGER: I need to take a short break.

(Recess.)





WAYNE A. COLEMAN

BY MR. SWEENEY:

**Q Mr. Coleman, was Border Patrol part of CBP?**

A It was after the March 3rd, 2003, stand-up, yes.

**Q And was it somehow a separate entity?**

A No, it is just that it was newly moving into Customs and they -- they have always held a rather special place in their own minds, at least, as to what kind of an organization they are.

**Q So in March of 2003, they're part of CBP; is that right?**

A They were just becoming part of Customs and Border Protection; that's right.

**Q And did Border Patrol have its own compensation staff?**

A No, it did not.

**Q Did it rely on CBP's compensation staff?**

A I would assume that if they had questions, that's who they would go to.

**Q And you said before that no one knew that Border Patrol was going to a sixth day a week training schedule; is that right?**

A That's correct.





WAYNE A. COLEMAN

**Q Well --**

A And let me clarify. I said that the -- nobody in the Human Resources office was aware of that. They did not come to us and say -- or come to Ronelle, so far as I know, and say they were planning to change the schedule for this group of employees.

**Q But when you say, "they," though, we are talking about CBP; is that right?**

A No, we are talking about Border Patrol.

**Q Is that a separate agency?**

A It is not a separate agency but within Customs and Border Protection, as within any large organization, a major division of an organization has its own program and intends to operate that way. When they have issues or questions, they will contact other -- the support functions, like Budget or like Human Resources, to assist them in resolving those issues. So if they had had questions about compensation or pay for their employees, they would have contacted the Human Resources office.

**Q So is what you are saying that Border Patrol, which is part of CBP, decides to make people work a sixth day and not pay them and doesn't bother**

WAYNE A. COLEMAN

**telling CBP's Human Resources people about it?**
A I am saying that they decided to send some people to FLETC for -- who was working on a sixth day of training and, so far as I know, they did not contact the Human Resources office and ask them whether or not that would have an impact on the employees' compensation.
**Q Let me try to get this straight, then. So who made the decision just to make them work six days and not pay them for it without going to the compensation folks?**
A I would assume the chief in the Border Patrol but I can't say exactly who the person was who made that decision.
**Q And who was the chief in the Border Patrol?**
A I can probably get you that name. I don't have it off the top of my head.
**Q In your experience, is that normal practice, that people would -- that a group like Border Patrol would make a decision to have people work a sixth day and not contact the compensation people to see if they had to pay them?**
A Well, I think if you will remember our





WAYNE A. COLEMAN

conversations during the deposition for the Moreno case that you asked very similar questions about the folks who went to FLETC for training there and we did not know, so they did not contact us.
**Q Well, but this training took place after everybody knew. Ms. Spero knew, Mr. Smith knew, Ms. Rotterman knew, OPM knew, ICE knew, CIS knew and OPM had posted this on its Web site; is that right?**
A The posting took place in about July of 2003, so if the training took place after that time, yes. The people that you just mentioned did know because they were involved with people who were doing that kind of training. Again, to the best of my knowledge, nobody in the Human Resources office was aware that Border Patrol had determined that they were going to send some people to FLETC for the sixth day of training.
**Q And do you know if the people that sent people to FLETC for the sixth day of training knew that there was an issue as to whether or not you had to pay people for that sixth day?**
A I can't say that for sure, no.
**Q Do you know that they didn't know that?**





WAYNE A. COLEMAN

A I know that they did not communicate with the Human Resources office and, therefore, the -- the Human Resources office was not able to brief them on the fact that this issue was under discussion.
**Q Do you know if FLETC was aware of the issue as to whether or not you had to pay for the sixth day of training?**
A The staff -- the FLETC staff itself, yes, was, clearly.
**Q And do you know when they became aware?**
A Since they have their own Human Resources office, I'm assuming they were following the issues, as were all of the agencies.
**Q So do you know if any of the FLETC Human Resources folks were sent Melissa Allen's e-mail that's Plaintiffs' Number 10?**
A I don't recognize any of those names as being from FLETC but I have to tell you that I don't know at this -- in March of 2003 who the director of Human Resources was, so that person's name may be there and I simply don't recognize it.
**Q Is it reasonable to assume that people at the FLETC were aware of the issue of paying for the**





WAYNE A. COLEMAN

**sixth day of training in March of 2003?**
A I think they were aware of the issue, yes.
**Q Let me show you a document that we marked in the Moreno case as Plaintiff's Exhibit Number 11 and perhaps we can mark as Porta Number 11.**
**(Porta Plaintiffs' Deposition Exhibit 11 identified.)**
**BY MR. SWEENEY:**
**Q Do you remember this document that we talked about during the Moreno case?**
A Yes, I do.
**Q And this document went out as a DHS broadcast; is that right?**
A That's correct.
**Q Would this document have gone to Ronelle Rotterman?**
A I can't say that for sure. It would depend on how the e-mail list was constructed. The purpose of this was to get to -- to the best of my recollection, anyway, was to get to the Legacy INS employees to let them know or to talk about the issue of the sixth day of training with them and let them know where we were at that point. That e-mail -- what I am saying is the e-mail list may

WAYNE A. COLEMAN
out but I knew that there were discussions around this issue.
**Q And there were a lot of discussions; right?**
A Yes.
**Q Okay. So is it safe to assume that Ronelle Rotterman knew that this was coming?**
MR. RAYEL: Objection; speculation.
THE WITNESS: I think it is safe to assume that once this was posted, she was -- she became aware of it, yes.
BY MR. SWEENEY:
**Q In July of 2003?**
A In July of 2003.
**Q So in July of 2003, Ronelle Rotterman, who was responsible for the compensation policy at CBP, knew that you were supposed to pay people for the sixth day of training at the FLETC; is that right?**
A That's correct, at least I would have to assume that would be correct, but I think one of the things I mentioned earlier was that the problem, if we are focusing back on the Porta people is, the problem was that Border Patrol then did not contact Ms. Rotterman and ask her or tell her about this





WAYNE A. COLEMAN
change in how they were going to train their employees and, therefore, the information was not communicated to them because at that point, as far as the Human Resources office knew, there was no need for them to know that.
**Q So let's go to that. We have established now, at least, that CBP knew about it, Ronelle Rotterman knew about it. Now let's see if we can figure out why these guys, these Border Patrol agents, weren't paid anyway.**
**Who made the decision to send the Border Patrol agents to a six-day-a-week training?**
A You asked me that earlier and I believe that I answered that the chief of the Border Patrol probably was the person who did that.
**Q And that person was --**
A I will have to get you his name. I don't remember it.
**Q Was it Mr. Waters?**
A No.
**Q Okay. And who does the chief of the Border Patrol report to?**
A Now, and since March of 2003, he reports to the commissioner of Customs.





WAYNE A. COLEMAN
**Q And who is the commissioner of Customs?**
A You asked me that before and I -- at the moment I can't tell you who it was at that point in time.
**Q And who does the commissioner of Customs report to?**
A Secretary of the Department of Homeland Security.
**Q Is the commissioner of Customs a political appointee?**
A Yes, I believe he is.
MR. RETTINGER: Calls for a legal conclusion.
BY MR. SWEENEY:
**Q Would the commissioner of Customs have known about the issue with respect to paying people for a sixth day of training?**
MR. RAYEL: Objection; speculation.
THE WITNESS: I would have to speculate on that but since Debbie Spero, the deputy, had received that e-mail from Melissa Allen that talked about the fact that that issue was being discussed, she may have mentioned that. I don't know.
BY MR. SWEENEY:





WAYNE A. COLEMAN
**Q Is Debbie Spero a political appointee?**
A No. She is a career employee.
**Q Career employee, and then the commissioner who she reports to is a political appointee; is that correct?**
A That's correct.
**Q And the chief of the Border Patrol reports directly to the commissioner or does he report to Debbie Spero?**
A He reports -- as far as I know, he reports directly to the commissioner.
**Q Okay. If Border Patrol is going to make a change in the hours that people work, are they supposed to check to see if that makes a difference in the amount you have to pay people?**
A It would be prudent management to do so.
**Q Okay. Do you know why -- did they do so in this case?**
A Again, to the best of my knowledge, no, they did not.
**Q Okay. Do you know why they did not?**
MR. RAYEL: Objection; speculation.
THE WITNESS: I would have to speculate on that.

WAYNE A. COLEMAN

**Q Well, an assistant chief, is that a fairly high position in the Border Patrol?**

A No. It is kind of an intermediate position. I'm sorry. It is not funny but there are a lot of assistant chiefs. They take the title as the equivalent of a rank in the military, so you have lots of captains and lots of majors in the military. You have lots of assistant chiefs in the Border Patrol.

**Q And would this assistant chief that you contacted have been someone specifically responsible for scheduling or for compensation?**

A It would have been somebody who was involved in scheduling training classes for Border Patrol agents, yes.

**Q And do you know who the assistant chiefs reported to?**

A They would have reported to chiefs.

**Q And how many chiefs are in the Border Patrol?**

A Oh, probably -- I don't know, I would say a lot.

**Q And who do the chiefs report to?**

A Well, eventually, the chiefs report to the





WAYNE A. COLEMAN

chief of the Border Patrol.

**Q I'm sorry. The chiefs report to the chief of the Border Patrol?**

A Yes, I know, it doesn't make any sense but that's the way it is.

**Q What is the first title of chief? Is that chief of what?**

A The chief of the Border Patrol is the person who is in charge of the entire Border Patrol.

**Q And the chief --**

A And that person now reports to the commissioner of Customs.

**Q And the chiefs that are under the chief of Border Patrol, are they chiefs of specific departments?**

A They are usually division directors or something like that within the Border Patrol, yes.

**Q Okay. So the assistant chief that you spoke to would have been within a specific division in the Border Patrol; is that right?**

A Yes, probably a branch chief.

**Q And would that division have been the division responsible for training?**

A Among other things, more than likely, yes.





WAYNE A. COLEMAN

**Q Okay. Now, I think you said a little while ago it was probably the chief of the Border Patrol who made the decision to send people to FLETC to train for six days; right?**

A Ultimately, yes.

**Q And now we are talking about the big chief; is that right?**

A Yes.

**Q Okay. Who else at Border Patrol would have known that these classes were training at FLETC for six days a week?**

A More than likely, the equivalent of this assistant chief that I spoke with earlier. My understanding of how Border Patrol is structured in headquarters here in Washington would be that there is a group, a branch, probably, who overseas the training function for Border Patrol agents.

**Q And would you assume that that assistant chief's chief knew about it, as well?**

A Yes. Certainly would be reasonable.

**Q Would the people that ran the Border Patrol Academy in South Carolina at the time have known about it?**

A That there was -- that they were sending





WAYNE A. COLEMAN

some people to FLETC for training?

**Q Yes.**

A Yes.

**Q And was there someone that was in charge of the academy in South Carolina?**

A Yes, I'm sure there is.

**Q Do you know what that title was?**

A I would assume director of Border Patrol Academy.

**Q Do you know if the director of the Border Patrol Academy would have known about the sixth day -- about payment for a sixth day of training?**

A I would have to speculate but I would think it would be unlikely.

**Q And why would it be unlikely?**

A I'm sure that that person is -- would be more concerned with actual training policy, scheduling of classes, and those sorts of things, the actual operation of the academy and making sure that the content of the material being trained was the kind of thing necessary to bring the new employee up to a level where they could begin to operate as a Border Patrol agent.

**Q And do you know who the director of the**

I, WAYNE A. COLEMAN, HEREBY DECLARE UNDER PENALTY OF PERJURY that I have read this transcript of my deposition, described below, and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted below.

10 JAN 2007
Date

WAYNE A. COLEMAN

NAME OF CASE: Porta v. United States, No. 05-14210C (Fed. Cl.) (consolidated with Barth v. United States, No. 05-759C (Fed. Cl.)).

DATE OF DEPOSITION: November 29, 2006

NAME OF WITNESS: Wayne A. Coleman

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

The following changes should be made throughout the document:

1. From – Border Patrol agent(s): to – Border Patrol Agent(s)
2. From – commissioner of Customs: to – Commissioner of Customs

Page __18____ Line __2____ Reason __3____
From __in__________________ to __and__________________

Page __18____ Line __6____ Reason __3____
From __in__________________ to __and__________________

Page __19____ Line __22____ Reason __1____
From __border__________________ to __broader__________________

Page __24____ Line __3____ Reason __3____
From __entity__________________ to __center__________________

Page __31____ Line __10____ Reason __3____
From __Chantilly__________________ to __Shanteli__________________

Page __40____ Line __12____ Reason __3____
From __tilting____________________ to __titling____________________

Page __63____ Line __25____ Reason __3____
From __No, that____________________ to __Not a____________________

Page __65____ Line __2____ Reason __3____
From __know____________________ to __no____________________

Page __82____ Line __11____ Reason __1____
Insert __non-Border Patrol Agent______ between __of__ and __employees__________

Page __82____ Line __18____ Reason __3____
From __Boarder____________________ to __Border____________________

Page __87____ Line __5____ Reason __3____
From __academy____________________ to __Academy____________________

Page __109____ Line __21____ Reason __1____
Insert __non-Border Patrol Agent______ between __the_____ and __Legacy____

Page __113____ Line __15____ Reason __1____
From __K.____________________ to __Kay____________________

Page __113____ Line __18____ Reason __1____
From __K.____________________ to __Kay____________________

Page __116____ Line __6____ Reason __1____
From __becomes____________________ to __about what is____________________

Page __116____ Line __8____ Reason __1____
From __controller general______________ to __Comptroller General______________

Page __120____ Line __9____ Reason __1____
From __551-421____________________ to __551.421____________________

Page __120____ Line __19____ Reason __1____
From __610-102____________________ to __610.102____________________

Page __125____ Line __4____ Reason __1____
From __This____________________ to __This Q&A____________________

Pages __143 & 144____ Lines __3, 9, 14 and 3____ Reason __1____
From __chief____________________ to __Chief____________________

Page __144____ Line __17____ Reason __3____
From __overseas__________________ to __oversees__________________

Page __145____ Lines __6 & 20____ Reason __3____
From __academy__________________ to __Academy__________________

Page __145____ Lines __9, 11, & 25____ Reason __3____
From __director__________________ to __Director__________________

Pages __147____ Line __10____ Reason __1____
From __chief__________________ to __Chief__________________

Page __153____ Line __20____ Reason __1____
From __none__________________ to __number__________________

Page __154____ Line __13____ Reason __1____
From __That__________________ to __They__________________

Page __155____ Line __4____ Reason __1____
From __backpay act__________________ to __Back Pay Act__________________

Page __156____ Line __3____ Reason __1____
From __Department______________ to __non-Border Patrol employees____________

Page __157____ Lines __6-7____ Reason __3____
From __commissioner__________________ to __Commissioner______________

Page __158____ Line __5____ Reason __3____
From __commissioner__________________ to __Commissioner______________

Page __159____ Line __2____ Reason __1____
Insert __in___________ between __were_____ and __the____________________

Page __173____ Line __18____ Reason __1____
From __advise__________________ to __advice__________________

Page __173____ Line __20____ Reason __1____
From __Backpay__________________ to __Back Pay__________________

Page __193____ Line __10____ Reason __1____
Insert __basic___________ between __of____ and __training_________________

I, VICKI L. DRAPER, HEREBY DECLARE UNDER PENALTY OF PERJURY that I have read this transcript of my deposition, described below, and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted below.

1-9-07
Date

Vicki L. Draper
VICKI L. DRAPER

NAME OF CASE: Moreno v. United States, No. 05-142C (Fed. Cl.)

DATE OF DEPOSITION: November 30, 2006

NAME OF WITNESS: Vicki L. Draper

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page __144____ Line __9____ Reason __3____
From __thought____________________ to __taught____________________

Page __156____ Line __16-18____ Reason __3____
From __Kate____________________ to __Kay____________________

Page __162____ Line __16____ Reason __3____
From __Kate____________________ to __Kay____________________

Page __167____ Line __16____ Reason __3____
From __Kate____________________ to __Kay____________________

Page __190____ Line __24-25____ Reason __3____
From __lead____________________ to __leave____________________

Page __203____ Line __7____ Reason __3____
From __FP____________________ to __FPM____________________