# EXHIBIT 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------- X

ARTURO MORENO, JR., )
individually and on behalf)
of others similarly )
situated, ) No. 05-142C
) Judge Firestone
)
Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )

Defendant.

------------------------------- X

Telephonic Deposition of Jerome Mikowicz
Thursday, January 11, 2007
Washington, D.C.

Job No.: 9926
Pages 1 - 297
Reported by: Kathy Savich, RPR

**perfectly allowed to do so, and should do so. Whether or not he raises an objection, you can always ask for clarity, you can always ask for something to be asked again; however, his raising of an objection doesn't mean that you cannot answer the question if you understand it. Is that okay?**

A. Yes. Thank you.

**Q. What is OPM's role in the federal government?**

A. If I understand, you're asking me just the general role of OPM, not my role.

**Q. Yes, I am.**

A. Okay. Sure.

The Office of Personnel Management is the central human resources or personal -- personnel management agency in the government. We are in charge of mere principles. We are in charge of policies affecting many aspects of human resources. That would include the gamut from employment to training, to labor relations, to classification of jobs, to performance management, etcetera.

And the Office of Personnel Management, therefore, has policy specialists





or human resource specialists who become specialized in certain areas, and then interpret laws that Congress passes, and writes regulations to implement those laws, and works with agencies to assist them in understanding and obeying those laws.

OPM may have several other types of roles that have grown over the years. An example might be a leadership role in a coordinated federal campaign, which is a type of a charity fund, etcetera. So I can't -- I'm not prepared to tell you exhaustively what OPM does, but I see it as having a statutory role.

We are an independent agency. We report to the President. We have authority in the executive branch mostly of the government. There are about 2.8 million white-collar employees that follow our laws and regulations in some fashion worldwide.

**Q. And you said there's 2.8 million white-collar employees.**

A. Correct.

**Q. Are there blue-collar employees, as well, that are affected by -- that OPM has**





**authority over?**

A. Yes.

**Q. And how many of those are there?**

A. I don't know the number positively. I will estimate the number is in the vicinity of about 250,000 that are covered by the Federal Wage System.

**Q. And is one of the areas that OPM has authority in interpreting the Fair Labor Standards Act?**

A. OPM has the role in administering the Fair Labor Standards Act. It would have statutory authority, it would issue regulations, and it would assist agencies.

**Q. And when you say "assist agencies," what do you mean by assist agencies?**

A. OPM publish regulations, for example. We ordinarily would have a proposed regulation. Agencies would comment on the regulations. We would take their comments into account in arriving at a final regulation, and therefore doing, we clarify, perhaps, the wording of our regulation, or we explain in supplementary information what the law requires and what are our regulations





mean. That would be a common way of assisting agencies.

Another way might be an agency has confusion or doubt about a matter in a regulation or encounters a new situation, it may contact OPM in some fashion requesting assistance, so those would be very typical examples.

**Q. Is it fair to say that OPM provides guidance to agencies on complying with the Fair Labor Standards Act?**

A. Yes.

**Q. You spoke a moment ago about OPM promulgating regulations. What's the process at which OPM promulgates regulations with respect to the Fair Labor Standards Act?**

A. Well, the Fair Labor Standards Act gives us authority to administer the program.

When OPM administers the program, it establishes regulations, and the typical process would be working under the Administrative Procedure Act to publish in the Federal Register a proposed regulation. This would be typical.

And as I mentioned, we would

position, but I was not there. I have asked others, including Bryce Baker, who I see his name is on this list, and he did not know of what those issues were.

**Q. So would you assume that Bryce Baker was at this meeting, and yet didn't know what those issues were, that those issues were not raised at the 3/27/03 meeting?**

A. That would puzzle me, and I would maybe speculate that it was not raised or not explained from the DHS point of view.

**Q. If OPM -- well, strike that.**

**If DHS disagreed with OPM's interpretation, would that slow down OPM from providing that interpretation to other agencies?**

A. Are you asking me as a general question or applied to this situation?

**Q. Well, let's start as a general question.**

A. As a general question, if an agency called and had disagreed with the way we construct the general schedule, and this is an actual example, we wouldn't give them much of a say because we have sole authority to do





that.

And there have been some challenges about how we round it, for example, and we have authority to do it. So by somebody simply disagreeing with us would not necessarily mean that everything would stop. The President signs an executive order. We have 24 hours to issue it. That's just the way it goes.

Getting to this situation, that if DHS or any agency said it had a concern with an OPM interpretation and it would want to discuss that, OPM would discuss it because OPM wants to arrive at the right answer.

Now, what would be important is what the agency would say. It would be based on what their reasoning of the situation is; their knowledge of the statute; their research; maybe more facts to put it into context. Maybe OPM didn't understand the original situation in a particular event or something.

So these meetings are normal, and don't happen frequently, but it's expected that we give the right answer, but we also





consult with some of our stakeholders if there are indications of any potential issues or disagreements or just concerns that they want to discuss.

**Q. And is that what happened in this case, that DHS's concerns slowed the process of OPM posting the guidance on their website?**

A. I don't know that for a fact, but I would say that it certainly was one of the events that occurred between the time when we arrived at a staff interpretation until we issued a final official OPM policy guidance.

I would also add that there's a context here. The Department of Homeland Security was under enormous pressure to gear up and establish itself, reorganization, and establish a new personnel system.

And the people on the list, to the best of my knowledge, were the people who were -- most of them anyway, were the people who were dealing with the restructuring and reorganization of the Department of Homeland Security. We had a statutory role in that.

So what I'm saying is there might be multiple things happening at any point in





time with regard to a meeting, with regard to conduct of business, with regard to everything that happened in that time period.

**Q. Let me ask you, you know, back in December, Ms. Draper's email is pretty clear. In fact, she says she's clear.**

A. Yes.

**Q. There is no option that people have to pay.**

A. That's right.

**Q. And this is a policy that affects everyone that trained at the FLETC, lots of agencies. Why did it take OPM until July of 2003 to post guidance on its website?**

A. Because we wanted to be sure that we did it the right way, that the answer was correct, that we had any input into it to make sure that we understood the problem as it existed not only for one agency, but for all agencies.

And that's a huge complexity we always face at OPM. I can write a regulation about the world as I know it. I'm a commuter. I work Monday through Friday. That's my world. I am not in the foreign service

overseas. I am not a law enforcement officer. I am not working in a small city or out in the country or traveling a lot.

So there are so many perspectives that bear on a decision. And so this is a major agency. It has a lot of law enforcement officers that are going into the training. They may or may not have had a different understanding, interpretation of the law.

I am going to assume that they did, they saw it some way differently, and that it was of enough concern that they wanted to meet with OPM and explain those concerns.

And I don't know where the concerns went in DHS; if they were in the personnel office alone, that's one layer of complexity; if they were in some parts of DHS. There were more than 20 agencies which were combined to form one system. Now, these people were trying to develop one policy for over 20 agencies that may have had different levels of expertise, different levels of understanding.

So they were, themselves, probably struggling to regularize their rules and make sure everybody follows the same way. And





plus, I don't know who handled their legal advice, and whether it was all centralized and one office maybe handled it or whether they had different general counsels from the various agencies that were part of the reorganization.

And I would personally think -- and this is my belief, not an OPM statement -- but I believe that this was more difficult than would meet the eye because of the coordination factor of a brand new entity formally composed of more than 20 that are trying to arrive with an answer on the payment of overtime for a new situation that never existed before on the sixth day, and probably there were different opinions on it.

**Q. Well, Ms. Draper's opinion is pretty clear. It says that regular working hours that are in the regulations, in the regulations governing overtime for training, that phrase is defined in the regulations, and, indeed, it is. What's complicated about that issue, Mr. Mikowicz?**

A. Well --

MR. PEASE: Objection, vague. You





can answer.

A. Yeah. Ms. Draper, unfortunately, does not have the regulatory authority of the director of OPM or the authority to post information on a website.

If her inclination was, "I have seen the law, I have my interpretation, here is the regulation, I want to post it," she would then potentially write something up or have a game plan to tell her supervisor. That would go up the chain of command to the deputy associate director. That would go to the associate director. That might go to the general counsel.

There are things all along the way that bring in briefing new people. Some people might say, "I'm not going to clear this policy unless I have a briefing. You need to explain this to me." And then, "What is your schedule? When are you available?" Well, that might -- we can't do it today. We have to wait until next week.

So, yes, Vicki Draper was convinced, it was clear to her so much so that she advised another agency what she





interpreted and what she felt would be OPM's interpretation of the correct answer. And so things were put in motion to get this out to be a clarified document.

And the way we ultimately chose to do it was a question and answer. We could have chosen a CPM, a Compensation Policy Memo. We could have chosen a fact sheet. I suppose we could have even chosen to do a proposed regulation, or possibly an interim regulation, to make this even more clear in the regulations.

So there were a lot of decisions to be made and a lot of players in the process. And out of all of our customers at this time, DHS was a special customer, because we had a statutory role to work with them to develop regulations for their new human resources system.

So as they're thinking about their new human resources system they're confronting something in their existing system. A lot of moving parts. A lot people involved. These task forces had, you know, a lot of people on them, more people than were at this meeting,

And the intervention of not only that he said that "I approve it" or "I clear it," and he said it's a draft, "I have reviewed and approved the draft," it now has to go through further steps.

And one of those steps became -- maybe not planned, but it became -- that there would be discussions with the major agency that had some issues, which we don't know, but had issues or concerns.

And so the process would be, "Let's see what those issues and concerns are, because, again, we want to get it right." So they had to go through that process of -- they chose to go through that process of talking with a major stakeholder in the whole law enforcement community to understand what their concerns and issues were.

**Q. I would like you to take a look at the document that's Bates stamped Moreno 220, if you would. We'll mark this as Plaintiffs' -- are we up to 35?**

MR. PEASE: I think we're 36.

THE COURT REPORTER: 36.

A. I have it in front of me.





(Exhibit No. 36 marked for identification.)

**Q. This document is an email from Bryce Baker to Jo Ann Perrini, Vicki Draper, and Don Winstead and it copies Melanie Watson.**

A. Right.

**Q. I just want to bring you down to the bottom -- well, first of all, it's an email that's talking about the definition of regular working hours; is that right?**

A. Well, I haven't read it right now, so let me just quickly go -- yeah, it's quoting the regularly scheduled administrative workweek, and it gets into the idea of regular schedules and what's considered overtime and within a workweek, yes.

**Q. And it's titled regular working hours; is that right?**

A. Oh, yes, of course.

**Q. Have you seen this document before?**

A. I think I have.

**Q. When?**

A. Well, it would have been in the period between Sunday and last night.

**Q. The last sentence, Mr. Baker says, "I have found the old FLSA history files that**





**OPM (Brown) interpreted the term regular working hours to include regularly scheduled overtime pay as far back as 1976."**

**Who was Dwight Brown?**

A. Dwight Brown was a retired master sergeant who worked at OPM. He was at OPM in 1974 when I started. Ironically, I was hired to work for him on the Fair Labor Standards Act. And when I reported to work three weeks after I accepted the job, I was assigned to the Federal Wage System, because they couldn't wait for me.

So anyway I just provided that information out of interest, but he was a person that had been a staff person who had worked on Title 5 overtime pay.

And then when the Fair Labor Standards Act was passed, he then worked on developing the first OPM -- sorry, that would have been Civil Service Commission, I guess -- information, and then turning it into instructions, and turning it later into rules. I am not sure how long he stayed after that date at OPM, but he was a staff person at that time.





**Q. And what are the old FLSA history files that Mr. Baker refers to?**

A. I don't know, but I could speculate that there were some office files somewhere around, and they might have been incorporated into our filing system, or sometimes when people retire they leave boxes of filing.

We put them in a garage, so to speak, we put them in a filing room, and years later somebody might have reason to start uncovering and looking.

But I'm speculating. I don't know specifically what old FLSA history files are.

**Q. And did you see OPM's -- did you see this old FLSA history file that Mr. Baker refers to in which OPM is interpreting the term regular working hours to include regularly scheduled overtime pay?**

A. No.

**Q. And when you saw this email, did you ask Mr. Baker about those notes?**

A. No.

**Q. And do you know if those notes that Mr. Baker referred to in March of 2003 have since been destroyed?**